## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| HSMY, Incorporated, | ) | |
| a Delaware Corporation, | ) | |
| a/k/a H.S.M.Y., Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 05-818 (JJF) |
| v. | ) | |
| | ) | |
| GETTY PETROLEUM MARKETING | ) | |
| INC., a Maryland Corporation. | ) | |
| | ) | |
| Defendant. | ) | |


**GETTY PETROLEUM MARKETING INC.'S OPENING BRIEF
IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT**


**DUANE MORRIS LLP**
Matt Neiderman (Del. I.D. No. 4018)
1100 North Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone: 302-657-4900
Facsimile: 302-657-4901

**OF COUNSEL**:

**DUANE MORRIS LLP**
Harvey W. Gurland, Jr., P.A.
(of the Florida Bar)
200 South Biscayne Blvd.
Miami, Florida 33131
Telephone: 305-960-2200
Facsimile: 305-960-2201


Attorneys for Defendant
Dated: January 4, 2006                    Getty Petroleum Marketing Inc.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... i

INTRODUCTION ................................................................................................1

STATEMENT OF UNDISPUTED FACTS .................................................................3

I.    The Elkton Road Station And The Franchise Agreements ...................................3

II.   The Operation Of The Elkton Road Station And Termination Of The Agreements ..........5

LEGAL ARGUMENT...........................................................................................6

I.    THE STANDARD GOVERNING GETTY'S MOTION TO DISMISS ...........................6

II.   COUNT II OF THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE
      DELAWARE RETAIL GASOLINE SALES LAW............................................7

III.  COUNT III FAILS TO STATE A CLAIM FOR FRAUD...............................................10

      A.    HSMY's Fraud Claim Lacks Particularity.............................................. 12

      B.    HSMY's Allegations Fail To State An Actionable Fraud Claim ......................... 13

IV.   COUNTS I AND IV FAIL TO STATE CLAIMS FOR BREACH OF
      CONTRACT ........................................................................................14

      A.    Count I Fails To State A Claim Under 6 *Del. C.* § 2-305..................................... 14

      B.    Count IV Of The Complaint Fails To State A Claim For Breach Of
            Contract....................................................................................... 18

V.    COUNT V FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED
      COVENANT OF GOOD FAITH .......................................................................20

VI.   HSMY WAIVED ITS RIGHT TO A JURY TRIAL.........................................................21

VII.  HSMY HAS ADVANCED NO BASIS FOR TREBLE DAMAGES.............................22

VIII. ATTORNEY'S FEES AND COSTS ................................................................22

# TABLE OF AUTHORITIES

## CASES

Page

*Alexander v. Whitman*,
    114 F.3d 1392 (3d Cir. 1997)...........................................................................................7

*Allapattah Services, Inc. v. Exxon Corp.*,
    333 F.3d 1248 (11th Cir. 2003) ...........................................................................16, 18

*Associated/ACC Int'l, Ltd. v. DuPont Flooring Sys. Franchise Co.*,
    2002 U.S. Dist. LEXIS 6464 (D. Del. Mar. 28, 2002) ...................................................15

*Atlantic Richfield Co. v. Tribbitt*,
    399 A.2d 535 (Del. Ch. 1977)........................................................................................10

*Au Rustproofing Ctr., Inc. v. Gulf Oil Corp.*,
    755 F.2d 1231 (6th Cir. 1985) .......................................................................................17

*Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*,
    296 F.3d 164 (3d Cir. 2002)..........................................................................................12

*Carefirst of Maryland, Inc. v. Care First Transportation, Inc.*,
    2002 U.S. Dist. LEXIS 22830 (D. Del. Nov. 1, 2002) .....................................................7

*Cincinnati SMSA Limited Partnership v. Cincinnati Bell Cellular Systems Co.*,
    708 A.2d 989 (Del. 1998) ..............................................................................................21

*Diamond Elec., Inc. v. Delaware Solid Waste Auth.*,
    1999 Del. Ch. LEXIS 45 (Del. Ch. Mar. 15, 1999)........................................................14

*Gaffin v. Teledyne, Inc.*,
    611 A.2d 467 (Del. 1992) ..............................................................................................12

*Graham v. State Farm Mut. Auto. Ins. Co.*,
    565 A.2d 908 (Del. 1989) ..............................................................................................23

*Grand Ventures, Inc. v. Whaley*,
    622 A.2d 655 (Del. Super. 1992).....................................................................................11

*H-M Wexford LLC v. Encorp, Inc.*,
    2003 Del. Ch. LEXIS 54 (May 27, 2003)......................................................................20

*Havird Oil Co., Inc. v. Marathon Oil Co., Inc.*,
    149 F.3d 283 (4th Cir. 1988) .........................................................................................16

*Iotex Communications, Inc. v. Defries*,
 1998 Del. Ch. LEXIS 236 (Del. Ch. Dec. 21, 1998) ........................................................14

*Kahn v. Dairy Mart Convenience Stores*,
 1996 Del. Ch. LEXIS 38 (Mar. 29, 1996) ......................................................................20

*Kelly v. McKesson HBOC, Inc.*,
 2002 Del. Super. LEXIS 39 (Jan, 17, 2002) ...................................................................21

*Lum v. Bank of America.*,
 361 F.3d 217 (3d Cir. 2004)..............................................................................................7

*MDNet, Inc. v. Pharmacia Corp.*,
 2005 U.S. App. LEXIS 11085 (3d Cir. June 13, 2005) .....................................................7

*Mark Fox Group, Inc. v. E.I. duPont de Nemours & Co.*,
 2003 Del. Ch. LEXIS 71 (Del. Ch. July 2, 2003) ...........................................................14

*Mathis v. Exxon Corp.*,
 302  F.3d 448 (5th Cir. 2002) .............................................................................15, 16, 18

*Merrill v. Crothall-American, Inc.*,
 606 A.2d 96 (Del. 1992) ..................................................................................................22

*Nat'l R.R. Passenger Corp. v. Nat'l Ass'n. of R.R. Passengers*,
 414 U.S. 453 (1974)............................................................................................................9

*Neugent v. Beroth Oil Co.*,
 560 S.E.2d 829 (N.C. App. Ct. 2002) .........................................................................16, 18

*People v. Craycroft*,
 2 Cal. 243 (Cal. 1852).......................................................................................................11

*Pollard v. Bailey*,
 87 U.S. 520 (1874)...............................................................................................................9

*Satellite Fin. Planning Corp. v. First Nat'l Bank of Wilmington*,
 633 F. Supp. 386 (D. Del. 1986)..................................................................................12, 13

*Schneider v. Wilmington Trust Co.*,
 310 A.2d 897 (Del. Ch. 1973)..............................................................................................9

*Scott v. Land Lords, Inc.*,
 1992 Del. LEXIS 349 (Sept. 22, 1992)..............................................................................20

*Shell Oil Co. v. HRN, Inc.*,
    144 S.W.3d 429 (Tex. 2004)..........................................................................17

*Shenandoah Life Ins. Co. v. Valero Energy*,
    1988 Del. Ch. LEXIS 84 (June 21, 1988)......................................................21

*Silvia v. Scotten*,
    122 A. 513 (Del. 1923) ...........................................................................10, 11

*TCP Indus., Inc. v. Uniroyal, Inc.*,
    661 F.2d 542 (6th Cir. 1981) .......................................................................16

*Vornado PS., L.L.C. v. Primestone Inv. Partners, L.P.*,
    821 A.2d 296 (Del. Ch. 2002)......................................................................14

*Wayman v. Amoco Oil Co.*,
    923 F. Supp. 1322 (D. Kan. 1996)................................................................16

*Winston v. Mandor*,
    710 A.2d 835 (Del. Ch. 1997).......................................................................19

*York Linings v. Roach*,
    1999 Del. Ch. LEXIS 160 (Del. Ch. July 28, 1999).....................................13

## STATUTES

6 <u>Del.C</u>. § 2-305, cmt. 3..................................................................................15, 16, 18

## <u>INTRODUCTION</u>

Plaintiff HSMY, Inc. ("HSMY") is a former dealer of defendant Getty Petroleum Marketing Inc. ("Getty")[1] and operated a retail gasoline service station in Newark, Delaware pursuant to written contracts, the most recent of which commenced on December 1, 2001 but was terminated by mutual agreement in February 2003. The allegations made by HSMY in this case can be boiled down to two affirmative claims of wrongdoing. HSMY first claims that Getty charged too much for the gasoline it sold to HSMY. HSMY's second claim is that Getty used electronic funds transfers ("EFT Debits") to collect amounts owed by HSMY either without proper notice or for items that should have been collected by other means. These two claims would appear to be relatively straight-forward breach of contract allegations. Upon closer scrutiny, however, HSMY's claims are legally deficient and should be dismissed.

As breach of contract claims, HSMY's allegations are deficient because they are inconsistent with and foreclosed by the explicit terms of the fully-integrated contract by which HSMY franchised its station from Getty. Although HSMY[2] now alleges, over two years after terminating its contract with Getty, that Getty charged too much for gasoline, Getty charged a posted or listed price as was specifically agreed upon by the parties and set forth in their contract. While HSMY may think the price too high or believe that it should have made more profits, the law is clear that HSMY cannot now hold Getty liable for following the price term set by the parties in their contract absent viable allegations of price discrimination – allegations missing

---

[1] Getty Petroleum Marketing Inc. is sued incorrectly herein as Getty Petroleum Marketing, Inc. (with an added comma).

[2] The plaintiff in this action, HSMY, Inc., is not even a valid Delaware entity, its charter having been declared void by the Delaware Secretary of State more than seven years ago. (*See* Statement of Good Standing for HSMY, Inc., attached hereto as Exhibit "A").

from HSMY's Complaint.  HSMY's claim relating to EFT Debits fares no better.  HSMY alleges that Getty used EFT Debits to collect amounts that should have been collected by other means and that Getty did so without proper notice, notwithstanding the parties' agreement that explicitly permits Getty to use EFT Debits to collect any amounts owed by HSMY and imposes no notice requirement.

Perhaps recognizing that its breach of contract claims conflict with the terms of the agreement, HSMY takes the same substantive allegations and tries to force them into other theories of recovery.  HSMY attempts to turn its allegations into fraud claims by adding vague allegations about what Getty initially promised but later failed to do – allegations that have repeatedly been rejected by Delaware courts as stating viable claims for fraud.  HSMY also relies on the same pricing allegations to seek recovery under the Delaware Retail Gasoline Sales Law (the "Gasoline Sales Law").  The Gasoline Sales Law, which is for the protection of the public and is primarily enforced by a specified state agency, provides for injunctive relief by a private party (relief HSMY, having terminated its agreement with Getty over two years ago, has no standing to seek).  The Gasoline Sales Law does not provide for the recovery of money damages which is the remedy HSMY seeks.  Finally, HSMY relies on the same allegations to advance a claim for breach of the implied covenant of good faith and fair dealing.  Because the subject matter of its claims are directly addressed by the parties' contract, HSMY does not and cannot allege any basis for implying additional, inconsistent terms, and that claim must also fail.  Getty thus seeks the dismissal of all counts of HSMY's Complaint for failure to state a claim upon which relief can be granted.

## STATEMENT OF UNDISPUTED FACTS[3]

### I.    The Elkton Road Station And The Franchise Agreements

Getty and HSMY entered into the series of agreements at issue in this lawsuit on or about December 5, 2001.  Pursuant to those agreements, HSMY operated a Getty motor fuel station located on Elkton Road in Newark, Delaware (the "Elkton Road Station" or the "Station"). (Compl. ¶¶ 3, 8).  The agreements entered into between HSMY and Getty included a Retail Gasoline Station Lease Agreement dated December 5, 2001 (the "Lease Agreement"), by which HSMY leased and operated the retail gasoline station property; a Lessee Supply Contract also dated December 5, 2001 (the "Supply Agreement" or "Supply Agr."), by which HSMY agreed to purchase the motor fuel to be sold at the station from Getty; and certain additional contracts related to the lease and maintenance of equipment used by HSMY in connection with the Station (the "Ancillary Agreements," which together with the Lease Agreement and Supply Agreement, are referred to as the "Agreements").  (Compl. ¶ 8).[4]

Under the Lease Agreement, HSMY and Getty agreed, among other things, to a monthly lease rate for the Elkton Road Station for a three-year period from December 5, 2001 to November 30, 2004, and for an allocation of responsibilities for the maintenance and operation of the Station.  HSMY also agreed to purchase a minimum monthly gallonage of gasoline from Getty.  Section 47 of the Lease Agreement contained an explicit merger clause, explaining that

---

[3] This Statement of Facts is derived from the allegations of the Complaint, which Getty assumes to be true for purposes of this Motion only, and from the explicit terms of the parties' contract, which forms the basis of plaintiff's claims against Getty excerpts of which are quoted in the Complaint.  (*See* Compl. ¶ 9).  Getty reserves the right to contest each and every factual averment in the Complaint to the extent necessary.

[4] True and correct copies of the Lease Agreement and Supply Agreement are attached hereto as Exhibits "B" and "C," respectively. While HSMY quoted or paraphrased selected portions of the Agreements in their Complaint, they failed to attach copies as exhibits.

the Agreements represented the entire understanding between the parties and that there were no

other agreements between the parties:

> The parties have set forth in this lease their entire understanding with
> respect to the Station.  With the exception of the Lessee Supply Contract
> and any of the agreements listed below [the Ancillary Agreements], there
> is no other agreement or understanding between the parties.

(Supply Agr. ¶ 47; Compl. ¶ 8).

Under the terms of the related Supply Agreement, HSMY agreed to purchase all motor

fuel to be sold at the Station from Getty.  (Compl. ¶ 8; Supply Agr. ¶ 17).  With respect to price,

the parties agreed that "**the prices for the products sold to [HSMY] shall be those posted or**

**listed by [Getty] at the time and place of delivery.  All prices are subject to change by**

**[Getty]."**  (Compl. ¶ 9; Supply Agr. ¶ 4) (emphasis added).  The Supply Agreement also

contained a provision permitting Getty to use electronic funds transfers ("EFT" or "EFT Debits")

from HSMY's bank account for any monies owed to Getty by HSMY under the Agreements:

> All payments due from Lessee shall be made in cash at the time of
> delivery except that <u>Company [Getty] in its sole discretion</u> may deliver
> on a C.O.D. (Check on Delivery) basis or <u>may require that all payments</u>
> <u>due from Lessee under this contract and all related agreements, including</u>
> <u>rental and other payments due under the Retail Gasoline Station Lease</u>
> <u>Agreement be made by electronic wire transfer of funds or by Electronic</u>
> <u>Funds Transfer</u> from Lessee's bank account to Company's bank account,
> or Company may extend other terms to be solely determined by
> Company.  <u>Company in its sole discretion may change payment terms</u>
> <u>and methods at any time without prior notice.</u>  Lessee shall execute and
> deliver to Company such forms or authorizations as may be necessary
> for electronic wire transfers or Electronic Funds Transfers.

(Supply Agr., ¶ 6) (emphasis added).  Both the Lease Agreement and the Supply Agreement

expressly provide that the parties waive a jury trial for all actions related thereto, other than

personal injury or property damage claims. (Supply Agr. ¶ 36).

At the same time Getty and HSMY entered into the Agreements for the operation of the

Elkton Road Station, they also entered into a separate Gasoline Loan Agreement (the "Loan

Agr.") (Exhibit "D" hereto), made to promote HSMY's conversion from a commissioned lessee agent of Getty to a retail lessee dealer. In exchange for HSMY's voluntary conversion to become a retail dealer, Getty agreed to finance HSMY's then-current gasoline inventory, thus enabling HSMY to pay for its inventory in monthly installments over a thirty-month period on an interest-free basis. (Loan Agr., at p.1).

## II.    The Operation Of The Elkton Road Station And Termination Of The Agreements

HSMY operated the Elkton Road Station pursuant to the Agreements from December 2001[5] until February 2003. On February 28, 2003, HSMY and Getty entered into a Mutual Cancellation of Lease and Supply Contract terminating the Agreements[6]. HSMY initiated this action over two years later, by filing a five-count Complaint (the "Complaint"). In its Complaint, HSMY makes two accusations of wrongdoing against Getty. HSMY alleges that Getty charged too much for gasoline and that Getty used EFT Debits to collect amounts from HSMY that HSMY alleges were to be paid through other means without fair notice. HSMY seeks money damages for Getty's alleged wrongdoing under theories of breach of contract, fraud, violations of the Delaware Retail Gasoline Sales Act and breach of the duty of good faith and fair dealing. Contemporaneously herewith, Getty filed a Motion to Dismiss the Complaint for failure to state a claim upon which relief can be granted. This is Getty's opening brief in support of its Motion to Dismiss the Complaint.

---

[5] HSMY originally began operating the Elkton Road Station pursuant to a different agreement in February 2001, but changed over to the form of Agreements at issue in this case in December 2001 after Getty ended its commissioned agent program.

[6] A copy of the parties' Mutual Cancellation of Lease and Supply Contract is attached hereto as Exhibit "E."

## LEGAL ARGUMENT

### I.    THE STANDARD GOVERNING GETTY'S MOTION TO DISMISS

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) should be granted where a plaintiff is not entitled to relief "under any set of facts that could be proven consistent with the allegations." *Alexander v. Whitman*, 114 F.3d 1392, 1397 (3d Cir. 1997). Although a court deciding a motion to dismiss must generally assume the truth of the factual allegations in the complaint, "this Court does not have to accept every allegation as true." *Carefirst of Maryland, Inc. v. Care First Transportation, Inc.*, C.A. No. 02-229, 2002 U.S. Dist. LEXIS 22830, at *7 (D. Del. Nov. 1, 2002). The Court also need not accept "conclusory allegations of law, unsupported conclusions and inferences" as true. *Id.* (citations omitted). In other words, "conclusory allegations unsupported by any factual assertions made in [the] complaint cannot withstand a motion to dismiss." *Id.* at *7-8. *Accord MDNet, Inc. v. Pharmacia Corp.*, 2005 U.S. App. LEXIS 11085, at *6 (3d Cir. June 13, 2005) (explaining that a court considering a motion to dismiss "need not accept as true unsupported conclusions and unwarranted inferences."). Moreover, in ruling on a Rule 12(b)(6) motion to dismiss, the Court may consider "documents that form the basis of a claim." *Lum v. Bank of America.*, 361 F.3d 217, 222 (3d Cir. 2004). A document forms the basis of a claim if the document is "integral to or explicitly relied upon in the complaint." *Id*.

While HSMY's allegations are couched in different terms based on the legal theories pled, its allegations of wrongdoing by Getty can be boiled down to two substantive claims. HSMY first claims that, notwithstanding the pricing provisions it agreed to abide by in the Agreements, Getty charged it too much for gasoline and therefore HSMY had less profits when it sold the gasoline. HSMY also alleges that, notwithstanding the plain language of the Agreements allowing Getty to use EFT Debits for any amounts owed by HSMY, Getty unfairly

used EFT Debits to collect amounts owed by HSMY and did so without proper notice.  In its Complaint, HSMY seeks monetary damages based on theories of breach of contract (Counts I, IV and V), violation of the Delaware Retail Gasoline Sales Law (Count II) and fraud (Count III). Viewed in light of the standards set forth above, each of HSMY's five counts of the Complaint fails to state a claim upon which relief can be granted and should be dismissed.

## II.    COUNT II OF THE COMPLAINT FAILS TO STATE A CLAIM UNDER THE DELAWARE RETAIL GASOLINE SALES LAW

HSMY alleges in Count II that Getty violated certain provisions of the Delaware Retail Gasoline Sales Law.  (*See* Compl. ¶¶ 45-57).  HSMY specifically alleges that Getty "directly or indirectly" violated the marketing agreement provisions of section 2909(4) by improperly maintaining control over retail prices charged by Getty through a temporary competitive voluntary allowance program (the "TCVA Program"), and HSMY seeks damages as a result. (*See* Compl. ¶¶ 31, 34).  HSMY does not, and, because it cancelled its Agreements with Getty over two years ago, cannot, seek injunctive relief against Getty.

The express provisions of the Gasoline Sales Law make clear that HSMY is not entitled to the monetary relief it seeks.  With respect to remedies for violations of the Gasoline Sales Law, Section 2911 provides for the creation of an Administrative Office to enforce the Gasoline Sales Law, and further provides that the Attorney General, the Administrative Office or "any aggrieved person may institute an action in <u>the Court of Chancery</u> to <u>enjoin</u> any person from engaging in or continuing a practice in violation of this chapter."  6 *Del. C.* § 2911 (emphasis added).  Importantly, § 2911 does not provide for actions for monetary damages, nor does it create any other private right of action.  Under settled rules of statutory construction, injunctive relief is HSMY's sole remedy under the Gasoline Sales Law – relief HSMY lacks standing to seek.

It is a fundamental tenet of statutory construction that "when a statute both creates a new right and prescribes a remedy, the latter is exclusive." *Schneider v. Wilmington Trust Co.*, 310 A.2d 897, 901 (Del. Ch. 1973) (citing *Pollard v. Bailey*, 87 U.S. 520 (1874)).[7]  Consistent with this long-standing maxim of statutory construction, but unlike the Gasoline Sales Law, other Delaware statutes creating new rights or causes of action, including statutes very similar to the Gasoline Sales Law, specifically provide for both equitable <u>and</u> legal remedies.  For example, the Delaware Unfair Cigarette Sales Act, 6 *Del. C.* §§ 2601-2608, which governs certain practices related to the sale of cigarettes, creates new rights and specifies both equitable and legal remedies for violations thereof:

> The Secretary [of Finance] or any person affected by an act in violation of this chapter, may file a complaint in the Court of Chancery for the county in which the alleged unlawful practice has been or is to be partially or completely performed, and the Court may enjoin any wholesaler from the commission of any such act, <u>and may award damages and costs.</u>

*Id.*, § 2607(a) (emphasis added).  As with the Gasoline Sales Law, the Cigarette Sales Act specifies injunctive relief as a remedy, but unlike the Gasoline Sales Law, specifically provides for monetary damages as a form of relief.  Similarly, the Motor Vehicle Franchising Practices Act, 6 *Del. C.* §§ 4901-4918, which governs and creates new rights related to the relationship between "manufacturers" and "distributors" of vehicles, specifies equitable and legal remedies,

---

[7] In *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n. of R.R. Passengers*, 414 U.S. 453, 458 (1974), the court noted that "a frequently stated principle of statutory construction is that when legislation expressly provides a particular remedy or remedies, courts should not expand the coverage of the statute to subsume other remedies."  The *National Railroad* court further explained that "[w]hen a statute limits a thing to be done in a particular mode, it includes the negative of any other mode," and held that since the statute at issue created both a public cause of action and a limited private cause of action "this maxim would clearly compel the conclusion that the remedies created in [the statute] are the exclusive means to enforce the duties and obligations imposed by [the statute]." *Id.* at 458.

and provides that an injured party "*may* bring an action for damages *and* equitable relief, including injunctive relief." *Id.* § 4916(a) (emphasis added).[8]  The fact that, unlike other Delaware statutes creating new rights, the remedies provision of the Gasoline Sales Law specifies equitable relief but makes no mention of claims for damages makes it clear that equitable relief is exclusive and money damages are not available.

The use of the word "may" in the Gasoline Sales Law, which also appears in nearly every remedies provision in Delaware statutes, does nothing to expand the enumerated remedies of that statute.  Rather, the use of the word "may" merely indicates what a person is permitted to do under the statute and does nothing to change the exclusive nature of the remedy provided. Indeed, such an argument was explicitly rejected by the Delaware Supreme Court in *Silvia v. Scotten*, 122 A. 513 (Del. 1923).   There, the plaintiff attempted to advance an expansive construction of the persons entitled to recover under Delaware's Death Act, which provided that an employer "*may* recover in his own name, or that of the injured employee." *Id.* at 516 (emphasis added).  In disagreeing with the plaintiff's construction of the statute, the Supreme Court first explained that "where a statute creates a new right, and prescribes a remedy for its violation, the remedy thus prescribed is exclusive." *Id.*  The Court then held that the Death Act both created a "new right," and specified "how [a person] may enforce it." *Id*.  Importantly, the Court also held that "the fact that the language is permissive (such being the nature of "may") in

---

[8] In fact, the Maryland Gasohol and Gasoline Products Marketing Act, *Md. Comm. Law Code An.*. § 11-301, *et seq.*, upon which the Delaware Gasoline Sales Law is modeled, *see Atlantic Richfield Co. v. Tribbitt*, 399 A.2d 535, 538 (Del. Ch. 1977), specifically provides for equitable *and legal remedies*: "Any person who violates any provision of this subtitle is liable for damages caused by the violation and is subject to the other legal or equitable remedies available to the party injured by the violation." *Id.*, § 11-307 (emphasis added).  Given that the Delaware Act was modeled after the Maryland Act, the specific inclusion of equitable remedies and the lack of legal remedies in the Delaware statute speaks volumes.

no wise detracts from the imperative necessity that the employer shall proceed according to one or the other permitted ways." *Id.* (quoting *People v. Craycroft*, 2 Cal. 243 (Cal. 1852) ("Where a right is given and a remedy provided by statute, the remedy so provided must be pursued.")).

Count II of the Complaint should also be dismissed in this case because HSMY lacks standing to seek any injunctive relief against Getty and because HSMY failed to bring its claim in the Court of Chancery. As Delaware courts have explained, standing to seek injunctive relief is premised on present damages or the likelihood of prospective damages incurred by the party seeking relief. *See Grand Ventures, Inc. v. Whaley*, 622 A.2d 655, 662 (Del. Super. 1992) (holding that plaintiff lacked standing to seek injunctive relief because the alleged damages had "occurred in the past"). HSMY affirmatively alleges at paragraph 21 of the Complaint that, "on or about March 30, 2003," it was forced to "turn the franchise back over to Getty." (Compl. ¶ 21). Any harm to HSMY as a result of alleged violations by Getty of the Gasoline Sales Law thus occurred in the past and necessarily cannot continue in the future. HSMY therefore lacks standing to seek injunctive relief – the only relief available under the Act. Even if HSMY somehow had standing to seek injunctive relief against Getty, however, Count II must nevertheless be dismissed, as jurisdiction over such claims lies exclusively in the Delaware Court of Chancery and this action was initially brought in the Superior Court of Delaware.

## III. COUNT III FAILS TO STATE A CLAIM FOR FRAUD

The elements of a fraud claim in Delaware are: (1) a false representation, usually of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or the defendant's reckless indifference to the truth; (3) an intent to induce the plaintiff to act or refrain from acting; (4) the plaintiff's action or inaction taken in reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. *Gaffin v. Teledyne, Inc.*, 611 A.2d

467, 472 (Del. 1992).  Pursuant to Federal Rule of Civil Procedure 9(b), in all allegations of

fraud, the "circumstances constituting fraud or mistake shall be stated with particularity."  Aside

from the element of scienter, "circumstances that constitute the remaining elements, if alleged on

information and belief, generally will not satisfy Rule 9(b)'s particularity requirement."  *Satellite*

*Fin. Planning Corp. v. First Nat'l Bank of Wilmington*, 633 F. Supp. 386, 403 (D. Del. 1986).

Instead, the particularity requirements of Rule 9(b), are met when the "complaint describes the

circumstances of the alleged fraud with precise allegations of date, time, or place *or* by using

some means of injecting precision and some measure of substantiation into their allegations of

fraud."  *See Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.,* 296 F.3d

164, 173 n.10 (3d Cir. 2002).  However, "[c]onclusory statements without supporting factual

allegations similarly will not suffice."  *Satellite Fin. Planning Corp.*, 633 F. Supp. at 403.

Under these standards, the allegations of Count III fail to state a viable claim for fraud.

HSMY points to two assurances allegedly made by Getty as the basis for its fraud claim.

Specifically, HSMY alleges that Getty "assured" it, with respect to EFT Debits, that:

> (1) no draft would occur until [Getty] had transmitted a facsimile notice
> of the draft; and (2) that the only items which would be drafted would be
> payment for (a) rent; (b) gas deliveries; (c) sign poles; and (d) credit card
> equipment rental.

(Compl. ¶ 37).  HSMY then alleges that those assurances by Getty amounted to fraud because

Getty later failed to do what it promised HSMY it would: "In fact, [Getty] made EFT Debits

without notice and for items which plaintiff had not agreed to pay by EFT Debits."  (*Id.*).

Importantly, HSMY does not allege any additional circumstances of the allegedly fraudulent

assurances, nor does it allege any material misrepresentations of past or present fact – as opposed

to promises of future conduct – made by Getty.

**A.      HSMY's Fraud Claim Lacks Particularity**

As set forth above, HSMY's fraud claim is premised on two assurances of future conduct by Getty which Getty allegedly later failed to abide.  (Compl. ¶ 37).  HSMY fails, however, to allege any of the circumstances surrounding the allegedly fraudulent statements.  HSMY does not allege, for instance: (1) who at Getty allegedly made the statement; (2) when the statements were made; (3) when HSMY discovered that the statements were false; (4) how and where the statements were communicated; (5) who at HSMY the statements were made to; (6) how or why Getty knew the statements to be false at the time it made them[9] and (7) whether the statements were made in connection with contract negotiations or were representations actually made as part of a contract.  HSMY also fails to allege in anything but purely conclusory language how it relied on the alleged fraud to its detriment and how its alleged damages resulted from such reasonable reliance.  *See Satellite Fin. Planning Corp.*, 633 F. Supp. at 403 ("The complaint also fails to allege plaintiffs' justifiable reliance such that any fraudulent misrepresentations made to them proximately caused damages claimed. Without plaintiffs' reasonable reliance upon defendants' misrepresentations and damage <u>directly resulting from the misrepresentations</u>, no fraud occurred under Delaware law.  Plaintiffs have not stated with even minimum particularity circumstances that allege either of these elements of the tort.").

---

[9] In fact, HSMY does not even allege that Getty's "assurances" concerning the use of an account for EFT debits in fact were false at the time they were made, thus providing another basis for dismissal of the fraud claim. *See York Linings v. Roach*, 1999 Del. Ch. LEXIS 160, at *10 (Del. Ch. July 28, 1999) (dismissing fraud claim where although counterclaim plaintiff alleged intentional failure to abide by representations, claimant "did not allege that these representations were false at the time [counterclaim defendant] made them, nor that [counterclaim defendant] knew that they were false").

**B.      HSMY's Allegations Fail To State An Actionable Fraud Claim**

HSMY's allegations of fraud are no more than breach of contract claims, accompanied by a recital of the elements of a fraud claim.  In other words, HSMY's purported fraud claims are comprised solely of allegations that Getty failed to do something it had earlier promised with respect to EFT Debits.  These allegations fail as fraud claims for at least two reasons.

First, as Delaware courts have recognized, a promise of future intent, without more, is not a sufficient basis for a fraud claim.  *See Vornado PS., L.L.C. v. Primestone Inv. Partners, L.P.*, 821 A.2d 296, 321 (Del. Ch. 2002).  Second, Delaware courts have uniformly held that "a breach of contract claim cannot be turned into a fraud claim[10] simply by alleging that the other party never intended to perform."  *Diamond Elec., Inc. v. Delaware Solid Waste Auth.*, 1999 Del. Ch. LEXIS 45, at *22 (Del. Ch. Mar. 15, 1999); *accord Mark Fox Group, Inc. v. E.I. duPont de Nemours & Co.*, 2003 Del. Ch. LEXIS 71, at *22 (Del. Ch. July 2, 2003).  *See also Iotex Communications, Inc. v. Defries*, 1998 Del. Ch. LEXIS 236, at *17 (Del. Ch. Dec. 21, 1998) (contract claim could not "be bootstrapped into a fraud claim merely by adding the words 'fraudulently induced' or alleging that the contracting parties never intended to perform").  *Accord Associated/ACC Int'l, Ltd. v. DuPont Flooring Sys. Franchise Co.*, 2002 U.S. Dist.

---

[10] Tellingly, HSMY makes essentially the same allegations in its breach of contract claim:

> Defendant repeatedly and intentionally breached its obligations to plaintiff under the Agreement, including but not limited to the following . . . Breached the agreement regarding EFT Credits and EFT Debits by unlawfully debiting funds from plaintiff's account and delaying the credit of monies properly owed . . .

(Compl. ¶ 42(B)).

LEXIS 6464, at *21 (D. Del. Mar. 28, 2002) ("even if [the defendant] knew when it entered into the Special Stipulations that the terms would put it in breach of the Perstorp Agreement and that, therefore, it knew that it would not fulfill its obligations under the Special Stipulations, this still would not amount to fraud").  HSMY's claim is simply that Getty failed to do what it earlier had agreed to do – a classic contract claim, but not a fraud claim.  Count III of the Complaint should therefore be dismissed for failure to state an actionable claim for fraud and for failure to plead the alleged fraud with particularity.

## IV.    COUNTS I AND IV FAIL TO STATE CLAIMS FOR BREACH OF CONTRACT

### A.    Count I Fails To State A Claim Under 6 *Del. C.* § 2-305

HSMY alleges in Count I of the Complaint that Getty breached the open price term of the Supply Agreement.  The apparent basis for this claim is that because the Supply Agreement gave Getty discretion to set the price it charged HSMY for gasoline, Getty had an implied duty pursuant to 6 *Del. C.* § 2-305(2) to set the prices it charged in good faith.  (Compl. ¶¶ 40-41).

Under section 2-305(2), where a contract provides that the price is to be fixed by the seller, the seller is to fix the price in good faith.  However, the official comment to § 2-305 specifically provides for a good faith "safe harbor" for sellers who utilize a "posted price" or "price in effect" standard, and the "safe harbor" applies in the "normal case."  *See* U.C.C. § 2-305, cmt. 3.  Accordingly, courts applying analogous state provisions have held that the good faith requirement of section 2-305 includes both objective and subjective duties, and that, absent "bad faith," the "safe harbor" reflected in Comment 3 applies.  *See Mathis v. Exxon Corp.*, 302 F.3d 448, 454 (5th Cir. 2002); *Allapattah Services, Inc. v. Exxon Corp.*, 333 F.3d 1248, n.16 (11th Cir. 2003).

Courts considering the issue have indicated that discriminatory or predatory pricing – prices set with the intent of driving the franchisee out of business and taking over the

franchisee's business – fall outside the scope of the "normal case." *See Mathis*, 302 F.3d at 458, n.15; *Wayman v. Amoco Oil Co.*, 923 F. Supp. 1322, 1349 (D. Kan. 1996) ("if there was evidence that Amoco had . . . engaged in discriminatory pricing or tried to run plaintiffs out of business, then the court's decision might be different"). As courts have explained, the purpose of section 2-305(2) is to "prevent discriminatory pricing – *i.e.*, to prevent suppliers from charging two buyers *with identical pricing provisions in their respective contracts* different prices for arbitrary or discriminatory reasons." *Neugent v. Beroth Oil Co.*, 560 S.E.2d 829, 836 (N.C. App. Ct. 2002) (emphasis added).

Numerous courts have also held that allegations that a distributor failed to charge the lowest price possible or that it charged prices that were <u>at or above the retail prices charged by a franchisee's competitors</u> (precisely what HSMY alleges here) were insufficient to support a viable claim under § 2-305 absent adequate allegations of price discrimination. *See, e.g., Havird Oil Co., Inc. v. Marathon Oil Co., Inc.*, 149 F.3d 283, 290 (4th Cir. 1988) (finding that "while it is true that some of Havird's competitors were selling gasoline at retail for less than Havird could obtain gasoline at wholesale, this does not constitute a breach of contract on the part of Marathon"); *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 548 (6th Cir. 1981) (explaining that "neither the [UCC] nor the Official Comments to the [UCC] require that a merchant-seller price at fair market value under a contract with an open price term, but specify that prices must be 'reasonable and set pursuant to 'reasonable' commercial standards of fair dealing in the trade'"); *Au Rustproofing Ctr., Inc. v. Gulf Oil Corp.*, 755 F.2d 1231, 1235-36 (6th Cir. 1985) ("Au contends that because its competitors sold gasoline for less than Au could buy it from Gulf, Gulf's prices were unreasonable . . . In our view, this contention is insufficient to establish that

prices set by Gulf contravened reasonable commercial standards of fair dealing in the gasoline market or otherwise constitute bad faith or commercially unreasonable behavior.").

Here, HSMY concedes in its Complaint that the price term agreed to by the parties was the "listed" or "posted" price at the time of delivery.  (Compl. ¶ 9).  HSMY fails, however, to allege that the "listed" or "posted" prices charged by Getty fell outside of the range of prices charged by other DTW dealers in the market.  Getty's pricing mechanism would, therefore, fall within the "safe harbor" of section 2-305(2) absent any viable allegations of subjective bad faith by Getty in setting its prices.  *See Shell Oil Co. v. HRN, Inc.*, 144 S.W.3d 429, 434 (Tex. 2004) ("the majority of decisions suggest that a commercially reasonable DTW price, that is, one within the range of DTW prices charged by other refiners in the market, is a good faith price under section 2.305 absent some evidence that the refiner used pricing to discriminate among its purchasers.").  In its Complaint, HSMY apparently attempts to avoid the operation of the safe harbor by purporting to allege discriminatory intent by Getty.  Upon careful review, however, HSMY's allegations of discrimination are contradicted by other of HSMY's allegations within the Complaint.

HSMY alleges, on information and belief, that Getty set the prices charged to HSMY in an attempt to "control plaintiff's profit margin, and to force, de facto, plaintiff into a commissioned agent relationship." (Compl. ¶ 11).  Yet HSMY goes on to allege that Getty had already terminated its commissioned agent (Gasway) program at the time it contracted with HSMY.[11]  (Compl. ¶ 32).  Of course, if no commissioned agent program or other alternative

_____

[11] HSMY alleges that the TCVA Program, which replaced the Gasway Program, was in effect in as of November 2001.  (Compl. ¶ 32).  Yet, as HSMY alleges, it entered into the contract about which it complains on December 1, 2001.  HSMY does not allege that any other pricing program

(Continued…)

pricing program existed at the time HSMY entered into the Agreements (something HSMY concedes), then the prices charged by Getty thereafter cannot have been intended to force HSMY into a commissioned agent program or any other program.   HSMY's allegations of price discrimination by Getty are thus facially defective.

Moreover, the purpose of section 2-305(2) is to prevent arbitrary price discrimination among dealers *with identical pricing provisions in their respective contracts*.   Here, however, HSMY does not allege that it was being charged a different price than other Getty dealers with identical pricing provisions.   Rather, HSMY complains only that it was being charged a price higher than other non-Getty branded competitors.   Thus, HSMY's complaint is not that it was treated differently than other similarly situated dealers as was the case in *Mathis*, *Allapattah* and numerous other cases, but that the prices charged by Getty were simply "too high" and that HSMY's profits were therefore too low.   Having contractually agreed to a specific pricing program, however, HSMY and Getty were bound by that program, and HSMY's allegations that prices were too high, without more, fails to state an actionable claim under section 2-305.   *See Neugent*, 560 S.E.2d at 836 ("we hold that once a seller sets a formula or standard to determine the price in the contract pursuant to UCC 2-305(2), both parties must abide by that formula or standard until mutually amended or changed").

---

(Continued…)

existed at the time it entered into the Agreements, nor does it allege that Getty was charging other similarly situated Getty franchisees lower or different prices than those it charged HSMY.

**B.    Count IV Of The Complaint Fails To State A Claim For Breach Of Contract**

Under Delaware law, the elements of a breach of contract claim law are: (1) the existence of a contract, (2) a breach of the contract, and (3) damage resulting from the breach. *Winston v. Mandor*, 710 A.2d 835, 840 (Del. Ch. 1997).  HSMY alleges in Count IV of the Complaint that Getty is liable for two breaches of the parties' Agreement.  First, HSMY alleges that Getty breached the open price term provision of the Supply Agreement by "charging plaintiff unreasonable and uncompetitive motor fuel prices . . ." (Compl. ¶ 42).  These allegations are identical to the allegations made in Count I for HSMY's claim under 6 *Del. C.* § 2-305, and the allegations fail to state a claim for the reasons set forth at Section II, *supra*.

HSMY's only other allegation is that Getty breached "the agreement regarding EFT Credits and EFT Debits by unlawfully debiting funds from plaintiff's account and delaying the credit of monies properly owed." (Compl. ¶ 83E).  Although the basis of HSMY's claim is difficult to assess given the lack of supporting factual allegations, HSMY's claim is, in all events, flatly contradicted by terms of the operative agreement regarding EFT debits and credits and thus foreclosed by the parol evidence rule.

Paragraph 6 of the Supply Agreement is the only provision of any of the Agreements relating to Electronic Fund Transfers.  That section provides in part that Getty:

> may require that <u>all payments due from Lessee under this contract and all related agreements, including rental or other payments due under the Retail Gasoline Station Lease Agreement, be made by electronic wire transfer of funds or by Electronic Funds Transfer from Lessee's bank account to Company's [Getty's] bank account</u> . . . Company in its sole discretion may change payment terms and methods at any time without prior notice . . . Lessee shall deliver to Company such forms or authorizations as may be necessary for electronic transfers or Electronic Funds Transfers.

(Supply Agr., ¶ 6) (emphasis added). Nowhere in its Complaint does HSMY identify any specific provision of the Supply Agreement breached by Getty, and the Supply Agreement does not by its terms establish a timeframe for any credit by Getty to HSMY, nor does it limit the items for which EFT Debits could be used as HSMY alleges. HSMY does <u>not</u> allege that Getty took money that HSMY did not owe, rather HSMY's allegations are that Getty unfairly timed the Debits or used the Debits to collect amounts it supposedly should have collected through other means. (*See* Compl. ¶ 37(A) – (B)). HSMY's allegations are therefore contradicted by the terms of the Supply Agreement, which give Getty broad discretion to collect any amounts owed to it by HSMY through EFT Debits and to set payment terms and methods. (*See* Supply Agr., ¶ 6).

Because HSMY's allegations are precluded by the terms of the Supply Agreement and because the Supply Agreement contains an explicit merger clause by which HSMY acknowledged that there were no other or different agreements, HSMY is barred from recovering based on Getty's supposed violation of terms not contained in and inconsistent with the terms of the Supply Agreement. *See Kahn v. Dairy Mart Convenience Stores*, 1996 Del. Ch. LEXIS 38, at *16 (Mar. 29, 1996) (granting summary judgment on breach of contract claim because the alleged breach was "squarely at odds with the contract language itself" and the contract language thus "undermines the entire premise of the plaintiffs' express contractual claim and, consequently, defeats it."); *Scott v. Land Lords, Inc.*, 1992 Del. LEXIS 349, at *7 (Sept. 22, 1992) ("Where the parties have made a contract and have expressed it in writing to which they both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understanding and negotiations will not be admitted for the purpose of varying or contradicting the writing"); *H-M Wexford LLC v. Encorp, Inc.*, 2003 Del. Ch. LEXIS 54, at *18 (May 27, 2003) ("a complaint may, despite allegations to the contrary, be

dismissed where the unambiguous language of the documents upon which the claims are based contradict the complaint's allegations"). HSMY's allegations relating to EFT Debits should therefore be dismissed for failure to state a claim.

## V.   COUNT V FAILS TO STATE A CLAIM FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH

Delaware courts have recognized that every contract in Delaware has an obligation of good faith and fair dealing, which is implied into the agreement by law. *Kelly v. McKesson HBOC, Inc.*, 2002 Del. Super. LEXIS 39, at *31 (Jan, 17, 2002). However, Delaware courts apply the doctrine cautiously, implying terms only in rare circumstances and only where the subject matter of the implied terms is not expressly addressed by the parties' agreement. *See Kelly*, 2002 Del. Super. LEXIS 39, at *31 ("The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract."); *Shenandoah Life Ins. Co. v. Valero Energy*, 1988 Del. Ch. LEXIS 84, at *25 (June 21, 1988) ("The covenant is breached only when one party to a contract seeks to prevent its performance by, or to withhold its benefits from, the other. The mere exercise of one's contractual rights, without more, cannot constitute such a breach.") (internal citation omitted)); *Cincinnati SMSA Limited Partnership v. Cincinnati Bell Cellular Systems Co.*, 708 A.2d 989, 990 (Del. 1998) (explaining that "in the narrow context governed by principles of good faith and fair dealing, this Court has recognized the occasional necessity of implying such terms in an agreement so as to honor the parties' reasonable expectations. But those cases should be rare and fact-intensive, turning on issues of compelling fairness" and affirming the decision of the Court of Chancery that, "given the unambiguous terms set forth in the agreement, no additional obligations may be inferred under any set of facts that could be proven to support plaintiff's complaint").

In Count V of its Complaint, HSMY alleges that Getty "breached the implied covenant of good faith and fair dealing," but HSMY offers no further supporting allegations in support of its claim other than its generic incorporation of the allegations of the other paragraphs of the Complaint. (*See* Compl. ¶¶ 44-45). Even giving HSMY the benefit of the doubt and assuming that the allegations that it relies upon for its breach of contract claims are also those it relies upon for its implied covenant claim, HSMY's allegations are legally insufficient. HSMY is attempting to use the implied covenant in this case to do precisely what Delaware courts have disallowed. That is, HSMY seeks to use the implied covenant despite (rather than in the absence of) express terms in the Lease Agreement and Supply Agreement dealing with gasoline pricing and with EFT Debits. This conclusion is further buttressed by the fact that HSMY does not add any substantive allegations in its implied covenant count, but instead relies upon its breach of contract allegations. HSMY does not even allege what specific implied term or terms it believes Getty breached; rather it simply alleges some undefined breach in vague and ambiguous terms. Nor does HSMY explain or otherwise allege what aspect of fraud or deceit it is relying upon for its claims. *See Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 101 (Del. 1992) ("to constitute a breach of the implied covenant of good faith, the conduct of the employer must constitute an aspect of fraud, deceit or misrepresentation."). HSMY's claim for breach of the implied duty of good faith should therefore be dismissed for failure to state a claim.

## VI.    HSMY WAIVED ITS RIGHT TO A JURY TRIAL

In both the Lease Agreement and the Supply Agreement, HSMY expressly agreed that it waived "trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever. . . ." (Lease Agr., ¶ 33; Supply Agr., ¶ 36). Such jury trial waiver provisions are

21

recognized as valid and routinely enforced under Delaware law. *See, e.g., Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 912 (Del. 1989) ("The availability of a jury trial for dispute resolution is not determinative, however. That right is not absolute but subject to waiver if the parties so intend."). Because this action, in which HSMY seeks monetary damages, does not involve personal injury or property damage claims, HSMY has waived its right to a trial by jury and its request for a jury trial should therefore be stricken if any claims are to proceed.

## VII.    HSMY HAS ADVANCED NO BASIS FOR TREBLE DAMAGES

In its prayer for relief at the conclusion of its Complaint, HSMY requests an award of "treble damages pursuant to 6 <u>Del. C.</u> § 2533." (Compl., p. 11). However, Section 2533 is the remedies provision for the Delaware Deceptive Trade Practices Act, found at 6 *Del. C.* §§ 2531-2536. Because HSMY does not even purport to assert a claim against Getty under the Deceptive Trade Practices Act anywhere in its Complaint, HSMY's request for treble damages under that Act should be stricken.

## VIII.   ATTORNEY'S FEES AND COSTS

In paragraph 37 of the Supply Agreement, HSMY agreed to reimburse Getty for reasonable attorney's fees and expenses resulting from defending "any claim brought against [Getty] by [HSMY] against which Getty successfully defends." To the extent the Court dismisses any of HSMY's claims, Getty respectfully requests that it be awarded reasonable attorney's fees and costs associated with this Motion.

**DATED:** January 4, 2006

**DUANE MORRIS LLP**

/s/ Matt Neiderman

Matt Neiderman (Del. I.D. No. 4018)

**OF COUNSEL:**

1100 North Market Street, 12th Floor

Wilmington, Delaware  19801

**DUANE MORRIS LLP**

Tel:     302.657.4900

Harvey Gurland, Jr., P.A. (*of the Florida Bar*)

Fax:    302.657.4901

200 South Biscayne Blvd., Suite 3400

Miami, Florida  33131

Tel:     305.960.2200

*Attorneys for Defendant*

Fax:    305.960.2201

*Getty Petroleum Marketing Inc.*

23