# EXHIBIT

# "A"



## Delaware Secretary
## of State Gateway

This data is for information purposes only, certification can only be obtained through the Division of Corporations, or from a Delaware Registered Agent's office located within the State of Delaware.

Source Info

### *Detail Information*

Date/Time of Results: 01-04-2006 at 11:48

| | | |
|---|---|---|
| File Number: 2544155 | Name Type: Inactive Delaware Co. | Stock Co Flag: Stock Company |
| Name: HSMY INCORPORATED | | |
| Kind: Corporation General | Status: Void as of 03-01-1998 | Tax Type: A/R Filing Required |
| Residency: Domestic | State of Incorp: DE | Country: US |
| Original Country: | Incorp/Qualify Date: 09-15-1995 | Foreign Incorporation Date: |
| Proclamation Date: 06-17-1998 | Renewal Date: | Expiration Date: |
| Bankruptcy Status: | Bankruptcy Date: | State: |
| Case Number: | Merged To: | State: |
| Federal ID: | Quarterly Filing?: | Last Annual Report: 1995 |

Registered Agent: 9021556
CHRISTIANA INCORPORATORS, INC.
508 MAIN STREET
WILMINGTON , DE19804

Registered Agent County: New Castle
Phone: 302-998-2008
Fax: 302-456-1911

### Stock Information:

Amendment Number: 000    Effective Date: 09-15-1995    Effective Time: 09:00

| Stock Seq Number | Description | Series | Class | Authorized | Par Value |
|---|---|---|---|---|---|
| 1 | COMMON | | | | |

### Filing History:

| Seq Number | Filing Year | Doc Code | Doc Code Desc | Doc Pages | Dom Pages | Doc Filing Date | Doc Filing Time | Doc Effective Date | Doc Filing Status | Co Prev Name | Merger Type |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1995 | 0102S | Incorp Delaware Stock Co. | 2 | | 09-15-1995 | 09:00 | 09-15-1995 | | | |

### Tax Info:

As Of Date: 01-04-2006Tax Balance: 174.40

| Tax Year | Total Filing | Total Taxes | Total Penalty | Total Interest | Total Other | Total Paid | Total Balance |
|---|---|---|---|---|---|---|---|
| 1998 | .00 | .00 | .00 | .00 | .00 | .00 | .00 |
| 1997 | .00 | 30.00 | 50.00 | .00 | .00 | .00 | 80.00 |
| 1996 | .00 | 30.00 | 50.00 | 14.40 | .00 | .00 | 94.40 |

Go Back

Go Back to Search

About LexisNexis  |  Terms and Conditions    |  Change Password
Copyright © 2006 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.
Delaware graphic courtesy of The General Libraries, The University of Texas at Austin.

# EXHIBIT

# "B"

# RETAIL GASOLINE STATION LEASE AGREEMENT

AGREEMENT made December 5, 2001 between GETTY PETROLEUM MARKETING INC. hereinafter called "Company," having its principal office at 125 Jericho Turnpike, Jericho, New York, 11753 and H. S. M. Y. Inc. hereinafter called "Lessee," residing at 76 Raintree Dr., Elkton MD 21921.

| | | |
|---|---|---|
| **STATION** | 1. | Company hereby leases to Lessee and Lessee hereby agrees to lease from Company the retail gasoline station located at 189 Elkton Rd., Newark DE 19711 (the "Station"). Account Number 086597. |
| **TERM OF LEASE** | 2. | The term of this lease shall be for a period of three (3) year(s), beginning on December 5, 2001 and ending on November 30, 2004, unless sooner terminated as provided in this lease. |
| **EXTENSIONS & RENEWALS** | 3. | In the event this lease should be extended or renewed or Lessee continues in hold over possession after the expiration of the term, with the consent of Company, all of the terms and conditions of this lease shall continue, and such holdover possession shall be considered a month to month tenancy only. |
| **RENTAL** | 4. | Lessee shall pay as rent the following sum per calendar month in advance, on the first day of each calendar month, without any set off or deduction whatsoever. At Company's option, rent and additional rent shall be paid by electronic wire transfer of funds or by Electronic Funds Transfer. Lessee shall execute and deliver to company such forms or authorizations as may be necessary for electronic wire transfers or Electronic Funds Transfers. |

For the period of ~~December 5, 2001 to December 31, 2001 - $0.00 per month;~~ *JANUARY 1, 2002 TO FEB 28, 2002 - $500 per MONTH* ← *this was ok*
For the period of ~~January 1, 2002~~ *MARCH 1, 2002* to November 30, 2002 - $550.00 per month;
For the period of December 1, 2002 to November 30, 2003 - $600.00 per month;
For the period of December 1, 2003 to November 30, 2004 - $650.00 per month.

| | | |
|---|---|---|
| **TAXES** | 5. | Lessee shall pay monthly, as additional rent, all increases in taxes over the sum of $196.66 per month which shall be imposed or assessed upon the land, building and other improvements constituting the Station. Payment of the foregoing shall be made at the same time and in the same manner as rent is paid pursuant to paragraph 4 of this lease. Lessee shall pay all personal property taxes and business use taxes related to the Station and the equipment located thereon. |
| **WATER & SEWER** | 6. | Lessee shall pay, as additional rent, all water and sewer charges. Charges for the current period shall be prorated for the period of Lessee's possession. |
| **HOURS OF OPERATION** | 7. | Lessee shall continuously operate and shall keep the Station open for gasoline sales the following hours: 24 hours per day 7 days a week. |
| **MINIMUM GALLONAGE** | 8. | Lessee shall purchase not less than 138,700 gallons of gasoline from Company or its designee, during every calendar month of the term hereof. |
| **ADDITIONAL RENT** | 9. | This lease provides that Lessee shall operate a retail gasoline station business and purchase gasoline in required minimum quantities. It is the principal business of Company to sell gasoline. This agreement has been entered into by Company based upon Lessee's covenant to purchase gasoline from Company or its designees, in at least the minimum quantities provided in Paragraph 8 of this lease. Were it not for that covenant, Company would not have entered into this agreement. Lessee agrees to provide adequate staff to provide service to its customers in accordance with the standards set forth in Paragraph 27 of the Lessee Supply Contract. In the event that Lessee does not purchase the minimum gallonage set forth in Paragraph 8 of this lease, Lessee shall pay, to Company, as additional rent, an amount equal to six ($.06) cents per gallon for the difference between the lesser quantity of gallonage purchased from Company or its designee |

Initials
Company
0299

Initials
Operator

1

during any month and the amount set forth in Paragraph 8 of this lease as the minimum gallonage. This, in no way, shall be considered a penalty clause, and it shall not affect Company's right to terminate this lease for failure of Lessee to meet the minimum quantities provided in Paragraph 8 of this lease.

**INSURANCE**    10.    Lessee shall pay the premiums for and provide to Company Certificates of Insurance evidencing the coverage below, which Certificates shall name Company, its designees, and the owners of the property on which the Station is situated as Additional Insured:

(a)    Property Insurance (All Risk Coverage) insuring the building and all improvements now or hereafter erected on the Station property for the full Replacement Value thereof, (but in no event less than $125,000), without penalty;

(b)    Lessor's Risk Only Public Liability Insurance in the amount of $1 million-Bodily Injury/Property Damage Liability.

(c)    General Liability Insurance in a Combined Single Limit of $1 million for, among other things, Bodily Injury and Property Damage Liability covering the Station and the sidewalks adjacent thereto, Completed Operations and Products Liability;

(d)    Workers' Compensation Insurance as required by law; and

(e)    Garagekeepers' Legal Liability Insurance in the amount of $50,000.

All policies and Certificates of Insurance shall provide that they can only be terminated or amended after not less than 60 days written notice to Company. Until such time as Lessee shall deliver to Company the Certificate of Insurance, evidencing the coverage referred to in Clause (a) of Paragraph 10 of this lease, with a carrier and in a form satisfactory to Company, together with paid premium receipts, Lessee shall pay to Company as additional rent the sum of $98 per month. The payment of additional rent pursuant to this Paragraph 10 shall not impose any obligation on Company to obtain insurance coverage for Lessee, or relieve Lessee of its obligation to provide the insurance coverage set forth in Clauses (b), (c), (d) and (e) of Paragraph 10.

**INSURANCE**
**COVERAGE &**
**ADDITIONAL**
**RENTAL**    11.    In the event that Lessee fails to provide evidence of any of the required coverage, required under Paragraph 10 of this lease, Company shall have the right but not the obligation to provide such coverage and charge Lessee for the cost thereof, as additional rent. Said charge to be independent of and in addition to any additional rent charge pursuant to Paragraph 10 of this lease. Nothing herein or in Paragraph 10 shall relieve Lessee of its indemnification obligations pursuant to Paragraph 34 of this lease.

**USE**    12.    Lessee shall use and occupy the Station for the sale of gasoline, petroleum products and such other merchandise, or use the bays, where permitted, for minor automotive repairs, as is approved by Company in writing.

**RESTRICTIONS**
**ON USE**    13.    Lessee shall not use the Station, or any part thereof, for automotive repairs or the parking, rental or sale of motor vehicles, or any other use not provided for in Paragraph 12 of this lease without Company's prior written consent. Lessee shall not permit or keep any dogs or other dangerous animals at the Station.

**MAINTENANCE:**
**COMPANY'S**
**OBLIGATION**    14.    Company, at its expense, shall make structural repairs deemed necessary by it to keep the building in operating condition, provided that repairs are due to ordinary wear or to damage by the elements and without any abatement of rent for the interruption caused thereby.

**MAINTENACE:**
**LESSEE'S**
**OBLIGATION**    15.    Lessee acknowledges that Lessee is taking the premises in its "AS IS" condition and Lessee shall be responsible for all maintenance and repairs other than the obligations of Company set forth in Paragraph 14 of this lease.   Lessee shall, at its expense: maintain the Station in a good, safe and operating condition and promptly make all repairs or replacements which are not the responsibility of Company under Paragraph 14 of this lease. Lessee shall also make all repairs or replacements which are occasioned by

Initials
Company
02/99

Initials
Operator

2

GAS STATION LEASE AGREEMENT COT 30

the acts or omissions of Lessee and Lessee's employees, agents and customers; keep adjacent sidewalks, curbs and driveways in good and safe condition and repair and free from snow, ice, obstructions, holes, cracks and other imperfections; keep the restrooms clean, neat, sanitary and adequately supplied; keep the Station in a clean, orderly and well lighted condition, free of trash, junk and debris; and replace damaged glass.

**FAILURE OF LESSEE TO COMPLY**     16.     If Lessee shall fail to comply with its obligations under Paragraph 15 of this lease, Company or its agent may enter upon the Station in order to take such remedial action as is necessary and may charge the cost of maintenance and repair to Lessee as additional rent.

**LOSS OF PRODUCT**     17.     Company shall not be liable or responsible for any loss, leakage or shrinkage of petroleum products or stocks, out of, through or from any tank or tanks, piping or other equipment located at or under the Station, prior to Company's receipt of written notice by Certified Mail, Return Receipt Requested, that the loss or leakage was due to a defect in the equipment owned or supplied by Company, which defect has been confirmed by Company in writing.

**INSPECTION**     18.     Company, for itself and its agents, reserves the right to enter the Station for the purposes of examining and inspecting the premises and any property of Company thereon.

**SUBORDINATION**     19.     This lease is subject and subordinate to all ground and underlying leases and to all mortgages or other security instruments which may now or hereafter affect this lease or the Station, and to all renewals, modifications, consolidations, replacements and extensions thereof. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lessee or by any mortgagee. In confirmation of such subordination, Lessee shall execute promptly any certificate that Company may from time to time request.

**COMPLIANCE WITH LAW**     20.     Lessee shall comply with all present and future laws, orders and regulations of all governmental authorities and recommendations of the board of fire underwriters.

**SIGNS**     21.     Lessee shall place no signs on the Station which do not relate to the retail gasoline station business without first obtaining Company's prior written consent. All signs shall be in compliance with all applicable laws. Lessee shall pay the charges, if any, for all sign permits.

**CONDITIONS OF RETURN**     22.     Lessee shall quit and surrender peaceably and quietly to Company, its agent or attorney, possession of the Station at the expiration or other termination of this lease, in good condition, except for ordinary wear and tear. If upon termination of this lease or abandonment of the Station by Lessee, Lessee abandons or leaves any personal property or equipment at the Station, Company shall have the right, without notice to Lessee, to store or otherwise dispose of the property or equipment at Lessee's sole cost, expense and risk, without being liable in any respect to Lessee.

**LESSEE SUPPLY CONTRACT & OTHER AGREEMENTS**     23.     Lessee shall fully and completely comply with the Lessee Supply Contract and other agreements entered into by it. Any breach or termination of the Lessee Supply Contract or of any other agreement between the parties shall be a breach or termination of this lease.

**UTILITIES**     24.     Lessee shall pay all charges for gas, water, electricity, telephone, heat, hot water, refuse removal, snow and ice removal and any other charges for services incurred at the Station.

**LIENS**     25.     Lessee shall not do any act, make any contract or have any work performed or materials supplied which may create or be a foundation for any lien or other encumbrance upon any interest of Company in the Station or of the owner of the real property, as applicable.

Initials
Company
02/99

Initials
Operator

3

GAS STATION LEASE AGREEMENT COT 30

| | | |
|---|---|---|
| **ALTERATIONS &<br>IMPROVEMENTS** | 26. | Lessee shall make no additions, changes, alterations or improvements to the Station or make any repairs without first obtaining Company's prior written consent. Any alterations or additions to any buildings or permanent improvements authorized by Company shall be completed in a good workmanlike manner and upon installation shall become the property of Company and Lessee shall have no right or interest therein except to continue to use same during the remainder of the term of this lease. |
| **EVENTS OF<br>DEFAULT** | 27. | Company and Lessee agree that each of the provisions of this lease is a material and substantial condition of the agreement between the parties relating to the lease of the Station. Company may immediately terminate this lease, upon two (2) days written notice, (or without notice in the event of a violation of subparagraph (c) below), and in any manner resume possession of the Station in the event the Lessee does not comply with any one of the terms and conditions of this lease, or upon any violation of any applicable law, statute, rule or regulation including by way of illustration but not limited to the happening of any of the following events: |
| **ABANDONMENT<br>OF STATION** | | (a) If the Station is closed or unattended for any period in excess of twenty-four (24) hours; or |
| **CEASE USE** | | (b) If Lessee fails to operate the Station primarily for the sale of gasoline; or |
| **COMMINGLING &<br>TRADEMARK<br>INFRINGEMENT** | | (c) If Lessee causes or suffers any grade of Getty brand gasoline to be mixed with another grade of Getty brand gasoline, or mixes any other brand or grade of gasoline with Getty brand gasoline in a storage tank connected to a dispensing pump on the premises, or if Lessee sells or holds out for sale as a Getty brand gasoline, gasoline which is not a Getty brand gasoline; or |
| **INSOLVENCY &<br>BANKRUPTCY** | | (d) If any insolvency, receivership or bankruptcy proceeding is instituted by or against Lessee or Lessee makes any general assignment for the benefit of creditors, or a receiver or trustee is appointed for Lessee or for any of Lessee's assets, or a judgment is entered against Lessee, or if any attachment, execution or like process is issued against the Lessee or any of Lessee's assets. |
| **COMPANY'S<br>REMEDIES** | 28. | In the event of any default by Lessee, re-entry by Company, expiration or termination of this lease or dispossess or eviction by summary proceeding or otherwise, Lessee shall be responsible for the following: |
| **RENT** | (a) | Rent up to the time of such re-entry, dispossess, eviction or expiration of the term of this lease, whichever is later; |
| **RENT<br>ACCELERATION** | (b) | Rent for the balance of the full term, all of which shall be accelerated and due and payable as of the date of default, re-entry by Company, termination of this lease or entry of a judgment of possession, whichever date first occurs; |
| **EXPENSES** | (c) | The payment of all sums incurred by Company in putting the Station in good order or preparing the same for re-rental, including brokerage and advertising expenses; |
| **ATTORNEY'S<br>FEES** | (d) | Reasonable attorney's fees and expenses resulting from Company enforcing any of the remedies described above, or in the enforcement of this lease or in defending any claim brought against Company by Lessee against which Company successfully defends; and |
| **OTHER** | (e) | Company shall have such other remedies as are then available to it in equity or at law; Company is under no obligation to mitigate damages. |

Initials
Company
\02/99

Initials
Operator

4

GAS STATION LEASE AGREEMENT COT 30

| | | |
|---|---|---|
| **ASSIGNMENT** | 29. | Lessee shall not assign, transfer or sublet the Station, or any part thereof, without first obtaining Company's written consent, which consent shall not be unreasonably withheld. In the event of any such assignment or subletting, by new lease or otherwise, Lessee shall continue to remain primarily liable to Company, jointly and severally with its assignee, for the performance of all Lessee's obligations for the remainder of the term of this lease. For the avoidance of doubt, any such assignment, transfer or sublet shall include the assignment of all agreements listed in Paragraph 47 as may be amended by the Company in its sole discretion pursuant to any such assignment, transfer or sublet. Prior to any such assignment, transfer or sublet Lessee or its transferee shall pay to Company a non-refundable administrative fee in connection with each such proposed assignment, transfer or sublet in an amount to be specified by Company from time to time which Company determines compensates Company for costs and expenses incurred with assignments, transfers and sublets. Without limiting Company's right to change such fees from time to time, Lessee acknowledges that the fee in effect on the date of this Agreement is $7,500.00. Lessee shall also pay to Company administrative fees from time to time imposed by Company which are in connection with changes in Lessee's operations, name or business structure, result in administrative cost or expenses to Company and are in an amount determined by Company to compensate Company for those costs and expenses. |

**To be transferred from account #086595/6**

| | | |
|---|---|---|
| **LEASE SECURITY** | 30. | Lessee has deposited with the Company the sum of $1,500.00 as security for the performance by Lessee of the provisions of this lease. In the event of Lessee's default or failure to comply fully with the provisions of this lease, Company may use, apply or retain the whole or any part of the security deposit to the extent required for the payment of any obligation of Lessee. In the event that Lessee fully complies with the terms and conditions of this lease, the security deposit less any deductions shall be returned to Lessee after the end of the term and after delivery of possession of the Station is given to the Company. This security deposit may also be applied to Lessee's obligations to Company under its Lessee Supply Contract or any other agreement with Company or to any other obligation of Lessee. Company shall pay to Lessee interest at the rate of 5% per annum, or such greater rate as may be required by law, on that amount of the security deposit returned to Lessee. |
| **FAILURE TO DELIVER POSSESSION** | 31. | Company shall not be liable for failure to give possession of the Station upon commencement of the term hereof. The rent shall not commence until possession is given or is made available to Lessee. |
| **UNDERLYING LEASE** | 32. | If Company is not the owner of the Station, then this lease shall be subject to all of the terms, provisions and conditions of the lease or other arrangement under which the Company holds the Station, and if such lease or other arrangement shall be canceled or terminated, this lease shall be automatically terminated or canceled, without any liability on the part of Company to Lessee. |
| **WAIVER OF TRIAL BY JURY AND COUNTERCLAIMS** | 33. | Lessee hereto waives trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of or in any way connected with this lease, the relationship of Company and Lessee, Lessee's use of or occupancy of the Station, or any other statutory remedy. In the event Company commences any dispossess or eviction proceeding for possession of the Station, Lessee will not interpose any counterclaim of any nature or description in such proceeding or file any action which could be consolidated with such proceeding. |
| **INDEMNITY** | 34. | (a)  As part of this business relationship, Lessee acknowledges that in furtherance of its obligations to assume full and complete responsibility for the operation of the Station, it has agreed to fully and completely be responsible for any liability to any third parties in any manner relating to the premises or the operation of the Station conducted from the premises. Accordingly, Lessee, by reason of the terms of this Paragraph 34, relieves the Company from any liability for any acts or omissions, including any negligence by the Company, and, at the same time, Lessee assumes responsibility for liability to third parties as a result of not only its own negligence but also that of the Company. Lessee understands that it can obtain insurance for the responsibility that it is assuming by this Paragraph 34 in the amounts provided for in Paragraph 10 hereof and, in doing so, it must name the Company as an additional insured as required in Paragraph 10 hereof. However, to the extent that Lessee does not obtain insurance which covers the risk, or the limits of the insurance policy are exceeded, Lessee shall also be responsible as set forth in the following subparagraph (b). |



Initials
Company
02/99

Initials
Operator

5

GAS STATION LEASE AGREEMENT COT 30

(b) Lessee agrees to defend, indemnify and hold Company and its subsidiaries and affiliates and their respective directors, officers, employees, agents and the owner of the premises harmless from and against any and all claims, demands and actions for, or in any way connected with, any accident, injury or damage whatsoever to any person or property arising out of, incidental to or happening in connection with, in any manner, the operations (including the storage and handling of products) to be carried out pursuant to this lease or any of its related documents, or by reason of any other casualty, or occurring on any of the sidewalks, drives, curbs and streets adjoining the same, or from the equipment and facilities thereon, regardless of any defects therein, or from any act or omission of Lessee or any subtenant or assignee and their respective licensees, servants, agents, customers, employees or contractors, and from and against all attorneys' fees, costs, expenses and liabilities including all costs, disbursements and attorneys' fees connected with and incidental to the establishment of this indemnity obligation (otherwise known as "pursuit costs") incurred in connection with any such claim or proceeding brought thereon whether such claims or actions are rightfully or wrongfully brought or filed. Lessee's obligations under this Paragraph 34 shall survive expiration or termination of this lease.

**CONDEMNATION** 35. If the whole or any substantial part of the Station shall be acquired or condemned by eminent domain or for any public or quasi-public use or purpose, then, and in that event, the term of this lease shall, at Company's sole option, cease and terminate from the date of title vesting and Lessee shall have no claim against Company for the value of any unexpired term of this lease. No part of any award for either a partial or total condemnation shall belong to Lessee and Lessee hereby waives any right it may have to make a claim therefor.

**SERVICES & LATE CHARGES** 36. Should any of Lessee's checks, electronic wire transfers, Electronic Funds Transfers or other method of payment be dishonored, stopped, or returned for any reason after delivery or transfer to Company, Lessee agrees to pay to Company an administrative service charge equal to the greater of $50.00 or three (3%) percent of the amount of any check or attempted transfer, to cover Company's costs and expenses. Any money owed by Lessee to Company after the due date shall bear interest at the rate of the lesser of 1 1/2% per month (18% annual percentage rate) or the maximum interest rate permitted by law. Company reserves the right, at any time upon sixty (60) days prior notice to Lessee, to increase the foregoing administrative service charge and/or the interest rate on money owed after the due date. Lessee understands and agrees that more than three (3) instances of dishonoring of checks and/or electronic wire transfers or Electronic Funds Transfers during any twelve (12) month period shall be an additional ground for default under Paragraph 27 of this lease.

**AS IS CONDITION & DISCLAIMER OF WARRANTIES** 37. Lessee accepts the premises in an "AS IS" condition. Company does not, in any way, represent or warrant the fitness of the premises for the use contemplated by Lessee and it shall be Lessee's obligation to make same fit at its sole cost and expense and to take all necessary safety precautions to safeguard the premises and all persons lawfully thereon. COMPANY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING ANY WARRANTY OF FITNESS OR OF MERCHANTABILITY.

**NO BROKER** 38. Lessee warrants and represents to Company that it has dealt with no broker, real estate salesman, or person acting as broker or finder, in connection with this lease. Lessee shall defend, indemnify and hold Company harmless from any and all claims, liabilities and/or damages which are based upon a claim by any broker, person, firm, or corporation for brokerage commission and/or other compensation by reason of having dealt with Lessee.

**NOTICE** 39. All notices and other communications which are required, shall be given by hand delivery or by Certified Mail, Return Receipt Requested, to the parties at their respective addresses first written above, or to the Lessee at the Station, or to such other address as either party may designate by like Certified Mail. Any such notices shall take effect upon hand delivery or three (3) days after the mailing thereof, as applicable.

**WAIVER** 40. Company's right to require strict performance shall not be affected by any previous waiver or course of dealings.

**BENEFIT** 41. This lease shall be binding upon and inure to the benefit of the parties hereto, their respective legal representatives, successors and assigns.

Initials
Company
02/99

Initials
Operator

6

GAS STATION LEASE AGREEMENT COT 30

| | | |
|---|---|---|
| **MARGIN CAPTIONS** | 42. | The margin captions are for convenience only and they shall not be deemed to reflect any intent of the parties or to be part of this lease. |
| **MODIFICATION** | 43. | No waiver, modification, change or alteration of the provisions of this lease, or any of the rights or remedies of either of the parties hereto, shall be valid, unless such waiver, modification, change or alteration is in writing, and signed by the party against whom enforcement is sought. |
| **APPLICABLE LAW** | 44. | This lease shall be construed in accordance with the laws of the state in which the Station is located. |
| **SEVERANCE** | 45. | In the event any provision of this lease is declared illegal, invalid, or unenforceable or contrary to law, it shall not affect any other part. |
| **BINDING UPON COMPANY** | 46. | This lease or any waiver, modification, or change hereof, shall not become binding upon Company until approved and executed by its Regional Manager or an Officer of the Company. |
| **ENTIRE AGREEMENT** | 47. | The parties have set forth in this lease their entire understanding with respect to the Station. With the exception of the Lessee Supply Contract and any of the agreements listed below, there is no other agreement or understanding between the parties: |

> Alternate Use Rider
> Credit Card Lease and Equipment Agreement
> Equipment Loan Agreement and Equipment Schedule
> Sign and Pole Agreement
> Water Paste Agreement
> Point-of-Sale Addendum
> Electronic Funds Transfer Forms

(Strike out where inapplicable and add others)

IN WITNESS WHEREOF, this Retail Gasoline Station Lease Agreement entered into on the day and year first above written.

GETTY PETROLEUM MARKETING INC.

By: _____
Bernard F. Walker, Regional Manager

_____
Witness

_____
H. S. M. Y. Inc. (Wahab Hussin-President), Lessee

Initials
Company
02/99
GAS STATION LEASE AGREEMENT COT 30

Initials
Operator

7

## GUARANTY

In consideration of Company's agreement to enter into the above lease with Lessee and for other good and valuable consideration, the undersigned does hereby promise and guaranty to Company full performance by Lessee of all the terms and conditions of the lease set forth above, the agreements listed in Paragraph 47 above and any riders, addendums, modifications, or amendments thereto and to any and all agreements now and hereafter made relating to the Station or the equipment thereon, and the undersigned guarantees payment to Company of all sums due to Company by reason of the aforesaid lease and agreements. If any monies are not paid to Company when due, or if any other default exists, the undersigned shall immediately pay such monies to Company on demand or cure such default and Company shall be released from any obligation to give notice or to make demand upon, or to pursue any remedy against Lessee. It is understood that this shall be a continuing guaranty and shall cover all obligations and indebtedness which Lessee now has or may incur in the future.


_____    _____

Wahab Hussin, Guarantor

76 Raintree Dr., Elkton MD 21921
Address


Dated: December 5, 2001

_____

Witness

# EXHIBIT

## "C"

# LESSEE SUPPLY CONTRACT

Contract made <u>December 5, 2001</u> between Getty Petroleum Marketing Inc., hereinafter called "Company," having its principal office at 125 Jericho Turnpike, Jericho, New York 11753 and <u>H. S. M. Y. Inc.</u>, hereinafter called "Lessee," residing at <u>76 Raintree Dr., Elkton MD 21921</u> and having a place of business to conduct a gasoline station at <u>189 Elkton Rd., Newark DE 19711</u>, hereinafter called the "Station," Account Number <u>086597</u>.

## PREAMBLE

Company, by reason of its maintenance of high standards of quality for the gasoline and petroleum products sold through its Getty gasoline stations, has created substantial demand and goodwill for products sold by stations operated under the trademark Getty. Lessee wishes, upon the terms and conditions contained in this contract, to enter into the business of operating a Getty gasoline station in accordance with the standards of quality and service approved by Company.

For good and valuable consideration, Company and Lessee hereby agree as follows:

**CREATION OF FRANCHISE**    1.    Company shall sell and Lessee shall purchase, during the entire term of this contract and any extensions and renewals hereof, the gasoline, motor oil and other products marketed and used by Company, as determined by Company.

**TERM OF CONTRACT**    2.    The term of this contract shall be for a period of <u>three (3)</u> years, beginning <u>December 5, 2001</u> and ending <u>November 30, 2004</u> unless sooner terminated as provided in this contract.

**EXTENSIONS & RENEWALS**    3.    In the event the term of this contract should be extended or renewed, or Lessee continues in-hold over possession of the Station after the expiration of the term, with the consent of Company, all of the terms and conditions of this contract shall continue, and such hold over possession shall be considered a month to month tenancy only.

**PRICE FOR PRODUCTS**    4.    The price for the products sold to Lessee shall be those posted or listed by Company at the time and place of delivery. All prices are subject to change by Company.

**TAXES**    5.    Unless otherwise specified, prices include taxes, duties, fees or other charges which Company may be required to collect or pay pursuant to any present and future laws, orders and regulations of any governmental authority.

**TERMS OF CREDIT**    6.    All payments due from Lessee shall be made in cash at the time of delivery except that Company in its sole discretion may deliver on a C.O.D. (Check On Delivery) basis or may require that all payments due from Lessee under this contract and all related agreements, including rental or other payments due under the Retail Gasoline Station Lease Agreement, be made by electronic wire transfer of funds or by Electronic Funds Transfer from Lessee's bank account to Company's bank account, or Company may extend other terms to be solely determined by Company. Company in its sole discretion may change payment terms and methods at any time without prior notice. Lessee shall execute and deliver to Company such forms or authorizations as may be necessary for electronic wire transfers or Electronic Funds Transfers.

**QUANTITY**    7.    Lessee shall order full truckload quantities of motor fuels, unless prevented from doing so because of limited storage capacity. However, in no event shall Lessee order less than the optimal delivery amount, as established by Company from time to time. Failure to order and receive such optimal delivery amount shall subject Lessee to a surcharge in the amount of $<u>130.00</u> for each such short delivery.



Initials
Company

Initials
Operator

84/97
GETTY7A.DOC

Case 1:05-cv-00186... Document 42... Filed 01/04/2006... Page 15 of 32

**DELIVERY** Deliveries may be made at the Station on any day of the week and at any time of the day or night and shall be promptly received by Lessee. Lessee agrees to receive deliveries by unmetered trucks. Deliveries shall be made only after orders have been placed by Lessee.

**COMPANY'S** 9. Company shall not be liable for loss or damage caused by and delay or failure to supply
**INABILITY** products because of compliance with any order, law or regulation of any governmental
**TO DELIVER** authority or public officer, or when the supply or distribution of products as contemplated
**PRODUCTS** by Company is interrupted, unavailable or inadequate because of wars, hostilities, public
disorders, acts of enemies, sabotage, strikes, lockouts, labor or employment difficulties,
fires, floods, acts of god, accidents or breakdowns, plant shut downs for repair,
maintenance or inspection, weather conditions or any cause beyond Company's control
whether or not similar to the foregoing.

*OK [handwritten] 4/05/02*

*'educed to $500.00 p.m starting 3/02*     **To be transferred from account #086595/6**

**CONTRACT** 10. Lessee has deposited with Company the sum of $25,000.00 as security for the performance
**SECURITY** by Lessee of the provisions of this contract. In the event of Lessee's default or failure to
comply fully with the provisions of this contract, Company may use, apply or retain the
*As of 11/4/2001, Getty HAS* whole or any part of the security deposit to the extent required for the payment of any
*received Approx $17,700 towards* obligation of Lessee. This security deposit may also be applied to Lessee's obligations
*to security. Dealer to pay* under its Retail Gasoline Station Lease Agreement with Company or any other agreement
*1000.00 per month beginning* with Company or to any other obligation of Lessee. In the event that Lessee fully complies
*Jan. 2002 until paid in full.* with all the terms of this contract and the retail Gasoline Station Lease Agreement and any
other agreements between the parties, the security deposit or balance thereof, shall be
*[handwritten initials]* returned to Lessee with interest at 5% per annum or at such higher rate as may be required
by law, after the date set forth as the end of the term or after delivery of possession of the
Station to Company, whichever is later.

**MANAGEMENT** 11. Lessee understands that Lessee is an independent business person and is to
conduct Lessee's business in Lessee's own name and at Lessee's own cost and expense.
Lessee shall not assume or create any obligation or responsibility on behalf of or in name of
Company, or bind Company in any manner, or make any representation or commitment on
behalf of Company.

**FULL TIME** 12. Lessee agrees that Lessee shall not operate the Station as an absentee owner. Lessee shall
**OPERATION** devote Lessee's full time and energies to the operation of the Station.

**USE** 13. Lessee shall use the Station solely as a retail gasoline station.

**TRADEMARK** 14. Company hereby grants to Lessee a license to use, and Lessee shall use Company's
trademarks, service marks, trade names, brand names, labels, insignias, symbols or
imprints to identify and advertise Company's products and shall not use such trademarks,
service marks, trade names, brand names, labels, insignias, symbols or imprints for any
other purpose. Lessee shall not use the name "Getty" in any corporate name of any
corporation which it may own or control or as part of its trade name without the written
consent of Company. The foregoing license shall terminate upon the termination of this
Contract, whereupon Lessee shall cease all such use.

**COMMINGLING** 15. Lessee shall not mix any other products with Company's products or adulterate them in any
way and shall not use Company's trademarks, trade names, brand names, labels, insignias,
symbols or imprints in connection with the storage, handling, dispensing or sale of any
adulterated, mixed or substituted products.

**TRADEMARK** 16. Lessee shall not sell gasoline and petroleum products received from any source other than
**PROTECTION** Company under the trademarks, service marks, trade names, brand names, labels,
insignias, symbols or imprints of Company or used by Company in its business.

2

Initials   Initials
Company   Operator
04/97
GETTY7A.DOC

**EXCLUSIVITY**  17.  Lessee shall sell only Company's gasoline and other petroleum products from the Station and shall not sell gasoline or petroleum products supplied by anyone else.

**COMPLIANCE WITH LAW**  18.  Lessee shall promptly comply with all present and future laws, orders and regulations of all governmental authorities with respect to the Station and the use of the equipment thereon.

**ADVERTISING**  19.  Lessee shall obtain Company's approval on signs and advertising, including color schemes.

**LEASE**  20.  Lessee shall fully and completely comply with provisions of the Retail Gasoline Station Lease Agreement entered into by Lessee as tenant of the Station and with the provisions of all other agreements between the parties. Any breach or termination of the Retail Gasoline Station Lease Agreement or of any other agreement between the parties shall constitute a breach or termination of this contract.

**LICENSES & PERMITS**  21.  Lessee shall obtain all required permits and licenses and pay all expenses, taxes and fees in connection with the maintenance and operation of the Station, the equipment and the business conducted thereon.

**INDEMNITY**  22.  (a)  As part of this business relationship, Lessee acknowledges that in furtherance of its obligations to assume full and complete responsibility for the operation of the Station, it has agreed to fully and completely be responsible for any liability to any third parties in any manner relating to the premises or the operation of the Station conducted from the premises. Accordingly, Lessee, by reason of the terms of this paragraph 22, relieves the Company from any liability for any acts or omissions, including any negligence by the Company, and, at the same time, Lessee assumes responsibility for liability to third parties as a result of not only its own negligence but also that of the Company. Lessee understands that it can obtain insurance for the responsibility that it is assuming by this paragraph 22 in the amounts provided for in paragraph 10 of the related Retail Gasoline Station Lease Agreement and, in doing so, it must name Company as an additional insured as required in paragraph 10 of such Lease. However, to the extent that Lessee does not obtain insurance which covers the risk, or the limits of the insurance policy are exceeded, Lessee shall also be responsible as set forth in the following subparagraph (b).

(b)  Lessee agrees to defend, indemnify and hold Company and its subsidiaries and affiliates and their respective directors, employees, agents and the owner of the premises harmless from and against any and all claims, demands and actions for, or in any way connected with, any accident, injury or damage whatsoever to any person or property arising out of, incidental to or happening in connection with, in any manner, the operations (including the storage and handling of products) to be carried out pursuant to this contract or any of its related documents, or by reason of any other casualty, or occurring on any of the sidewalks, drives, curbs and streets adjoining the same, or from the equipment and facilities therein, regardless of any defects thereon, or from any act or omission of Lessee or any subtenant or assignee and their respective licensees, servants, agents, customers, employees or contractors, and from and against all attorneys' fees, costs, expenses and liabilities including all costs, disbursements and attorneys' fees connected with and incidental to the establishment of this indemnity obligation (otherwise known as "pursuit costs") incurred in connection with any such claim or proceeding brought thereon whether such claims or actions are rightfully or wrongfully brought or filed. Lessee's obligations under this Paragraph 22 shall survive expiration or termination of this contract.

**UNIFORMS**  23.  Lessee and all its employees shall be dressed in uniforms approved by Company when working at the Station.

Initials
Company

Initials
Operator

04/97

GETTY7A.DOC

3

| | | |
|---|---|---|
| **INSPECTION-QUALITY CONTROL** | 24. | Lessee shall permit Company, by its representatives or agents, to enter onto the Station at any time to inspect the Station, to obtain samples of gasoline and other products, and to take pump and gasoline stick readings. |
| **MINIMUM GALLONAGE** | 25. | Lessee shall purchase not less than <u>138,700</u> gallons of gasoline from Company or its designee during every calendar month of the term of this contract. |
| **HOURS OF OPERATION** | 26. | Lessee shall keep the Station open for business the following hours: <u>24 hours per day 7 days a week</u> |
| **STANDARDS** | 27. | Lessee shall operate the Station in accordance with Company's standards of quality, appearance, cleanliness and service, provide adequate illumination for the Station and shall provide qualified and neatly dressed attendants to render first class service to customers. |
| **UNLEADED SAFEGUARD** | 28. | Lessee agrees that it shall be its responsibility that unleaded gasoline is not contaminated and meets the specifications of all governmental authorities. Lessee shall comply with good operational practices to ensure against contamination. |
| **WATER CONTAMINATION** | 29. | Lessee shall prevent water contamination of gasoline by daily tank gauging, in compliance with water testing procedures as set forth in the Paste Agreement. |
| **SALES INFORMATION** | 30. | Lessee shall provide information daily of the number of gallons of gasoline and other product sales, including the total dollar amount. Lessee shall permit Company to inspect Lessee's books and records relating to such sales, and shall provide such other information as the Company from time to time shall request, as in its judgment, it shall deem necessary. |
| **MAINTAIN INVENTORY RECORDS** | 31. | Lessee shall maintain accurate daily inventory records for all products and notify Company of any unusual inventory discrepancies. Lessee shall provide copies of such records to Company upon request. Company shall not be responsible for any loss, leakage or shrinkage of petroleum products at the Station through or from any tank or other equipment. Furthermore, if Lessee fails to maintain accurate daily inventory records or to notify Company of any discrepancies and Company is required to test the underground storage tanks and/or other equipment at the Station, Lessee shall be responsible for any and all costs, associated with such required testing. |
| **PMPA TO APPLY** | 32. | Both parties agree to incorporate in this contract by reference all of the provisions of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq. ("PMPA"). The rights and obligations conferred or imposed by PMPA upon a franchisor shall apply to Company and the rights and obligations imposed upon a franchisee shall apply to Lessee, as that statute may from time to time be amended, changed, interpreted or construed by law. |
| **EVENTS OF DEFAULT** | 33. | Lessee and Company recognize that each provision of this contract is a material and substantial condition of the agreement between Company and Lessee, whereby Lessee is authorized to sell Company's products. Company may immediately terminate this contract, upon two (2) days written notice to Lessee, or such other notice given in accordance with applicable law (or without notice in the event of a misbranding or trademark violation), and in any manner take possession of the equipment and at its option may suspend deliveries of gasoline or petroleum products during any period of default, in the event Lessee does not comply with any one of the terms and conditions of this contract, or upon any violation of any applicable law, statute, rule or regulation, including by way of illustration but not limited to the happening of any one of the following events: |

Initials
Company
04/97
GETTY7A.DOC

Initials
Operator

4

(a)  If Lessee has made any false or misleading statement in connection with its application to become a dealer of Company; or

(b)  If Lessee ceases to operate the Station primarily for the sale of gasoline; or

(c)  If any lease or sublease covering the Station is terminated; or

(d)  The occurrence of an event which is relevant to the relationship of Company and Lessee under this contract and as a result of which, termination of this contract is reasonable, for example, but not by way of limitation:

**OTHER GROUNDS FOR TERMINATION**

(1) Fraud or criminal misconduct by Lessee relevant to the operation of the Station; or
(2) Filing for or declaration of bankruptcy or judicial determination of insolvency of Lessee; or
(3) Lessee's death or continuing severe physical or mental disability of at least three (3) months duration which renders Lessee unable to provide for the continued proper operation of the Station; or
(4) Loss by Company of its right to grant possession of the Station through termination or expiration of any underlying lease; or
(5) Condemnation or other taking, in whole or in part, of the Station pursuant to the power of eminent domain; or
(6) Loss by Company of its right to grant the right to use the pertinent trademark, except if such loss is through the fault or negligence of Company; or
(7) Destruction of all or a substantial part of the Station; or
(8) Failure of Lessee to pay to Company in a timely manner when due, all sums to which Company is legally entitled; or
(9) Failure of Lessee to operate the Station for seven (7) consecutive days or for such shorter period of time which Company deems to be an unreasonable length of time, considering the surrounding facts and circumstances; or
(10) Lessee's willful adulteration, mislabeling or misbranding of motor fuels or other trademark violation by Lessee; or
(11) Knowing failure of Lessee to comply with federal, state or local laws or regulations relevant to the operation of the Station or to its dealings with Company; or
(12) Conviction of Lessee of any felony involving moral turpitude.

**WITHDRAWAL FROM MARKET**

(e) A determination made in good faith by Company to withdraw from the marketing of motor fuel through retail dealer outlets in the relevant geographic marketing area which the Station is located.

**RIGHT NOT TO RENEW**

34.  Company further reserves the right to elect not to renew this contract at the end of the term hereof, by notice given in accordance with applicable law, upon any grounds which give Company the right to cancel and terminate this contract or upon any of the following grounds:

(1)  The failure of Company and Lessee to agree to changes or additions to the provisions of this contract which are the result of determinations made by Company in good faith and in the normal course of business; or
(2)  A determination by Company in good faith and in the normal course of business: (a) to convert the Station to a use other than for the sale or distribution

5

Initials
Company
04/97
GETTY7A.DOC

Initials
Operator

of motor fuel; (b) to materially alter, add to, or replace the Station; (c) to sell the Station; or (d) that the renewal of this relationship is likely to be uneconomical to Company despite any reasonable changes or additions to the provisions of this relationship which may be acceptable to Lessee; or

(3)  The receipt by Company of numerous bona fide customer complaints concerning Lessee's operation of the Station; or

(4)  The failure of Lessee to operate the Station in a clean, safe and healthful manner on two (2) or more occasions.

| | | |
|---|---|---|
| **REMEDIES AT LAW** | 35. | Company, in the event of any breach or default by Lessee in connection with any terms or conditions of this contract, shall be entitled to all lawful damages, and in connection with Lessee's default under paragraphs 13 (violating the use to which the Station may be put) or 14 (violating Company's trademarks) or 15 (commingling or mixing Company's products with that of another) or 16 (selling another product under Company's trademarks) or 17 (not purchasing all of Lessee's requirements of gasoline and petroleum products from Company), Lessee acknowledges and recognizes that injunctive relief to Company is essential for the adequate remedy of any such violation of these Paragraphs by Lessee and that there are inadequate remedies at law for such breaches. |
| **WAIVER OF TRIAL BY JURY** | 36. | The Lessee hereto waives trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other (except for personal injury or property damage) on any matters whatsoever arising out of or in any way connected with this contract, the relationship of Company and Lessee, or any other statutory remedy. In the event Company commences any action against Lessee, Lessee will not interpose any counterclaim of any nature or description in such proceeding or file any action which could be consolidated with such proceeding. |
| **ATTORNEY'S FEES** | 37. | Lessee shall pay and reimburse Company for reasonable attorney's fees and expenses resulting from enforcing any of the provisions of this contract or defending any claim brought against Company by the Lessee against which Company successfully defends. |
| **APPLICATION OF PAYMENT** | 38. | Company shall have the option of applying any payments made by Lessee to any unpaid items open on its books, without regard to the direction or request of Lessee and without relieving Lessee of any obligation otherwise existing with respect to the item to which Lessee requests payment be applied. |
| **SERVICE AND LATE CHARGES** | 39. | Should any of Lessee's checks, electronic wire transfers, Electronic Funds Transfers or other method of payment be dishonored, stopped, or returned for any reason after delivery or transfer to Company, Lessee agrees to pay to Company an administrative service charge equal to the greater of $50.00 or three (3%) percent of the amount of any check or attempted transfer, to cover Company's costs and expenses. Any money owed by Lessee to Company after the due date shall bear interest at the rate of the lesser of 1 1/2% per month (18% annual percentage rate) or the maximum interest rate permitted by law. Company reserves the right, at any time upon sixty (60) days prior notice to Lessee, to increase the foregoing administrative service charge and/or the interest rate on money owed after the due date. Lessee understands and agrees that more than three (3) instances of dishonoring of checks and/or electronic wire transfers or Electric Funds Transfers during any twelve (12) month period shall be an additional ground for default under Paragraph 33 of this contract. |

Initials Company
04/97

Initials Operator

GETTY7A.DOC

| | | |
|---|---|---|
| TRANSFER OR ASSIGNMENT | 40. | This contract shall not be transferred or assigned by Lessee without obtaining Company's prior written consent, which consent shall not be unreasonably withheld. In the event of an assignment, Lessee shall continue to remain primarily liable to Company, jointly and severally with its assignee, for the performance of all Lessee's obligations for the remainder of the term of this contract. |
| ENTIRE AGREEMENT | 41. | The parties have set forth in this contract their entire understanding. With the exception of the Retail Gasoline Station Lease Agreement for the Station and other agreements listed thereon, there is no other agreement or understanding between the parties. |
| SEVERANCE | 42. | In the event any provision of this contract is declared illegal, invalid or unenforceable or contrary to law, it shall not affect any other part. |
| APPLICABLE LAW | 43. | This contract shall be construed in accordance with the laws of the state in which the Station is located. |
| MODIFICATION | 44. | No waiver, modification, change or alteration of the provisions of this contract or any of the rights or remedies of either of the parties hereto shall be valid, unless such waiver, modification, change or alteration is in writing, and signed by the party against whom enforcement is sought. |
| MARGIN CAPTIONS | 45. | The margin captions are for convenience only and they shall not be deemed to reflect any intent of the parties or to be part of this contract. |
| BENEFIT | 46. | This contract shall be binding upon and inure to the benefit of the parties hereto, their respective legal representatives, successors and assigns. |
| WAIVER | 47. | Company's right to require strict performance shall not be affected by any previous waiver or course of dealing. |
| DEFINITION | 48. | The phrase "Company's gasoline and other petroleum products" or variations thereof, as used in this contract shall be deemed to refer to gasoline or petroleum products supplied by Company or its designees. |
| NOTICE | 49. | All notices and other communications shall be given by hand delivery or by Certified Mail, Return Receipt Requested, to the parties at their respective addresses first written above, or to the Lessee at the Station, or to such other address as either party may designate by like Certified Mail. Any such notices shall take effect upon hand delivery or three (3) days after the mailing thereof, as applicable. |
| BINDING UPON | 50. | This contract or any waiver, modification or change thereof, shall not become binding upon Company until approved and executed by its Regional Manager or an Officer of the Company. |
| BONU GALLONS | 51. | The Company shall pay Lessee an incentive amount equal to two ($.02) cents per gallon for the difference between 138,700 gallons and the actual amount of gallons purchased from Company or its designee during any full calendar month during the term of this Lease if the amount so purchased shall be more than 138,700 gallons. |

Initials Company

Initials Operator

04/97

GETTY7A.DOC

7

IN WITNESS WHEREOF, this Lessee Supply Contract entered into the day and year first above written.

GETTY PETROLEUM MARKETING INC.

BY: _____
　　　Bernard F Walker, Regional Manager

_____
Witness

_____
H. S. M. Y. Inc. (Wahab Hussin-President) Lessee


## GUARANTY

In consideration of Company's agreement to enter into the above contract with Lessee and for other good and valuable consideration, the undersigned does hereby promise and guaranty to Company full performance by Lessee of all the terms and conditions of this contract and any riders, modifications or amendments thereto and to any and all agreements now or hereafter made relating to the Station or the equipment thereon, and the undersigned guarantees payment to Company of all sums due Company by reason of the aforesaid agreements. If any sums of money are not paid to Company when due, or if any other default exists, the undersigned shall immediately pay said sums to Company on demand or cure such default and Company shall be released from any obligation to give notice or to make demand upon, or to pursue any remedy against Lessee. It is understood that this shall be a continuing guaranty and shall cover all obligations and indebtedness which Lessee now has or may incur in the future.

_____
Wahab Hussin, Guarantor

76 Raintree Dr., Elkton MD 21921
Address

_____
Witness

Dated: December 5, 2001

Initials　　Initials
Company　Operator
04/97
GETTY7A.DOC

# Summary of Title I of the Petroleum Marketing Practices Act

Agency: Department of Energy
Action: Notice

Summary: This notice contains a summary of Title I of the Petroleum Marketing Practices Act, a new federal law enacted on June 19, 1978. The law is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. The summary describes the reasons for which a franchise may be terminated or not renewed under the new law, the responsibilities of franchisors, and the remedies and relief available to franchisees. Franchisors must give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

## SUPPLEMENTARY INFORMATION:

Title I of the Petroleum Marketing Practices Act, Pub. L. 95-297 (the "Act"), enacted on June 19, 1978, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel. Section 104(d)(1) of the Act provides that the Secretary of Energy shall prepare and publish in the *Federal Register*, not later than 30 days after enactment of the Act, a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title.

As required by section 104(d)(1) of the Act, the following is a summary statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees. Franchisors must give copies of this summary statement to their franchisees when entering an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

## SUMMARY OF LEGAL RIGHTS OF MOTOR FUEL FRANCHISEES

This is a summary of the franchise protection provisions of the federal Petroleum Marketing Practices Act. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

The franchise protection provisions of the Act apply to a variety of franchise arrangements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973 regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney, in order to enforce your legal rights.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

You should note that the Act does not restrict the reasons which may be given for the *termination* of a franchise agreement entered into before the June 19, 1978 effective date of the Act. However, any *nonrenewal* of such a terminated franchise must be based on one of the reasons for nonrenewal summarized below.

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below, under the heading "Notice Requirements for Termination or Nonrenewal."

The Act allows trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act itself (Pub. L. 95-297, 92 Stat. 322, 15 U.S.C. 2801).

## I. Reasons for Termination

The following is a list of the only reasons for which your franchise is permitted to be terminated by the Act. One or more of these reasons must be specified if your franchise was entered into on or after June 19, 1978 and is being terminated. If your franchise was entered into before June 19, 1978, as discussed above, there is no statutory restriction on the reasons for which it may be terminated. If such a franchise is terminated, however, the Act requires the supplier to renew the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

If your supplier attempts to terminate a franchise which you entered into on or after June 19, 1978 for a reason that is not listed under this heading, you can take the legal action against your supplier that is described below under the heading "Your Legal Rights."

### Non-Compliance with Franchise Agreement

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. In order to use this reason, your supplier must have learned of the non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

### Lack of Good Faith Efforts

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise for a period of 180 days before you receive the notice of termination.

### Mutual Agreement to Terminate the Franchise

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of this agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

### Withdrawal from the Market Area

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted.

### Other Events Permitting a Termination

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement.

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, *if* you were given written notice before the beginning of the term of the franchise or the duration of the underlying lease *end* that the underlying lease might expire and not be renewed during the term of the franchise.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral fortitude.

(13) Any event that affects the franchise relationship and as result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew your franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### Failure to Agree on Changes or Additions to Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of preventing renewal of the franchise, your supplier may decline to renew the franchise.

### Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises

entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

**How Much Notice Is Required**

In most cases, your supplier must give you notice of termination or nonrenewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

**Manner and Contents of Notice**

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain.

(1) a statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action.

(2) the date the termination or nonrenewal takes effect; and

(3) a copy of this summary.

**IV. Trial Franchises and Interim Franchises**

The following is a description of the special requirements that apply to trial and interim franchises.

**Trial Franchises**

A trial franchise is a franchise entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of one year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

**Interim Franchises**

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed 3 years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based upon a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

**V. Your Legal Rights**

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy

the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act.

**FURTHER DISCUSSIONS OF TITLE I—DEFINITIONS AND LEGAL REMEDIES**

**I. Definitions**

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the foregoing summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

**Franchise**

A franchise is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

**Franchise Relationship**

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

**Franchisee**

A franchisee is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

**Franchisor**

A franchisor is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

**Marketing Premises**

Marketing premises are the premises which, under a franchise, are to be employed by the franchisee in connection of sale, consignment, or distribution of motor fuel.

**Leased Marketing Premises**

Leased marketing premises are marketing premises owned, leased, or in any way controlled by a franchisor and which the franchisee is authorized or permitted, under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

**Fail to Renew or Nonrenewal**

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the

expiration date stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

**II. Legal Remedies Available to Franchisee**

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

**Franchisee's Right to Sue**

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

**Equitable Relief**

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

**Burden of Proof**

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

**Damages**

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the law's requirements or the franchisee's rights under the law, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

**Franchisor's Defense to Permanent Injunctive Relief**

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the nonrenewal of the franchise relationship was a determination made in good faith and in the normal course of business,

(1) to convert the leased marketing premises to a use other than the sale or distribution of motor fuel.

(2) to materially alter, add to, or replace such premises

(3) to sell such premises.

(4) to withdraw from marketing activities in the geographic area in which such premises are located; or

(5) that renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice requirements of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on August 23, 1978.

Reprinted from the
Federal Register
August 30, 1978

Form 26-342-PMP (9-83)

ACT OF OCTOBER 19, 1994, PUB L. NO. 103-371, 1994 U.S.C.C.A.N. (108 STAT.) 3484

# Petroleum Marketing Practices Act Amendments of 1994

An Act to amend the Petroleum Marketing Practices Act

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## SECTION 1. SHORT TITLE

This Act may be cited as the "Petroleum Marketing Practices Act Amendments of 1994."

## SECTION 2. CONVERSION TO COMPANY OPERATION.

Section 102(b)(3)(A)(iii) of the Petroleum Marketing Practices Act (15 U.S.C. 2802(b)(3)(A)(iii)) is amended by inserting after "purpose of" the following: "converting the leased marketing premises to operation by employees or agents of the franchisor for the benefit of the franchisor or otherwise."

## SECTION 3. UNDERLYING LEASES.

Section 102(c)(4) of the Petroleum Marketing Practices Act (15 U.S.C. 2802(c)(4)) is amended—

(1) by striking "lease, if" and all that follows through "(B) of" and inserting the following: "lease, if—
"(A) the franchisee was notified in writing, prior to the commencement of the term of the then existing franchise—
"(i) of the duration of the underlying lease; and
"(ii) of"; and

(2) by adding at the end the following new subparagraphs:
"(B) during the 90-day period after notification was given pursuant to section 104, the franchisor offers to assign to the franchisee any option to extend the underlying lease or option to purchase the marketing premises that is held by the franchisor, except that the franchisor may condition the assignment upon receipt by the franchisor of—
"(i) an unconditional release executed by both the landowner and the franchisee releasing the franchisor from any and all liability accruing after the date of the assignment for—
"(I) financial obligations under the option (or the resulting extended lease or purchase agreement);
"(II) environmental contamination to (or originating from) the marketing premises; or
"(III) the operation or condition of the marketing premises; and
"(ii) an instrument executed by both the landowner and the franchisee that ensures the franchisor and the contractors of the franchisor reasonable access to the marketing premises for the purpose of testing for and remediating any environmental contamination that may be present at the premises; and

"(C) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession (through an assignment pursuant to subparagraph (B) or by obtaining a new lease or purchasing the marketing premises from the landowner), the franchisor (if requested in writing by the franchisee not later than 30 days after notification was given pursuant to section 104), during the 90-day period after notification was given pursuant to section 104—
"(i) made a bona fide offer to sell, transfer, or assign to the franchisee the interest of the franchisor in any improvements or equipment located on the premises; or
"(ii) if applicable, offered the franchisee a right of first refusal (for at least 45 days) of an offer, made by another person, to purchase the interest of the franchisor in the improvements and equipment.".

## SECTION 4. WAIVER OF RIGHTS.

Section 105 of the Petroleum Marketing Practices Act (15 U.S.C. 2805) is amended by adding at the end the following new subsection:

"(f)(1) No franchisor shall require, as a condition of entering into or renewing the franchise relationship, a franchisee to release or waive—
"(A) any right that the franchisee has under this title or other Federal law; or
"(B) any right that the franchisee may have under any valid and applicable State law.
"(2) No provision of any franchise shall be valid or enforceable if the provision specifies that the interpretation or enforcement of the franchise shall be governed by the law of any State other than the State in which the franchisee has the principal place of business of the franchisee.".

## SECTION 5. PREEMPTION.

Section 106 of the Petroleum Marketing Practices Act (15 U.S.C. 2806) is amended—
(1) in subsection (a)—
(A) by inserting "(1)" after "(a)"; and
(B) by adding at the end the following new paragraph:
"(2) No State or political subdivision of a State may adopt, enforce, or continue in effect any provision of law (including a regulation) that requires a payment for the goodwill of a franchisee on the termination of a franchise or nonrenewal of a franchise relationship authorized by this title."; and
(2) in subsection (b)—
(A) by inserting "(1)" after "(b)"; and
(B) by adding at the end the following new paragraph:
"(2) Nothing in this title shall prohibit any State from specifying the terms and conditions under which any franchise or franchise relationship may be transferred to the designated successor of a franchisee upon the death of the franchisee.".

## SECTION 6. DEFINITION OF FAILURE.

Section 101(13) of the Petroleum Marketing Practices Act (15 U.S.C. 2801(13)) is amended—
(1) by striking "or" at the end of subparagraph (A);
(2) by striking the period at the end of subparagraph (B) and inserting in lieu thereof "; or"; and
(3) by adding at the end the following new subparagraph:
"(C) any failure based on a provision of the franchise which is illegal or unenforceable under the law of any State (or subdivision thereof).".

Approved October 19, 1994.

RECEIPT ACKNOWLEDGED:

Date _12-5-01_

Name _Wahaab Hossie_

Address _189 Elkton Rd. Newark DE_

Location # _P609_

Signature _[signature]_

## TCVA PROGRAM

In order to assist retail gasoline dealers to financially compete with severe price competition, Getty Petroleum Marketing Inc. (hereinafter "Getty" or "Company" interchangeably ) has available a Temporary Competitive Voluntary Allowance Program (TCVA) for its dealers.

TCVA is monetary aid given to dealer measured in cents and fractions of cents, per gallon, to assist the dealer in meeting competitive market conditions.

The program operates as follows:

I.    When a dealer finds that dealer is having trouble meeting competitive market conditions, dealer can make a request for aid under the TCVA Program. This request to participate in the Program must be in writing and witnessed by a Company employee. An example of such a request is attached as Exhibit "A".

II.   Once this written request is received by Getty, a Company representative will document, through a price survey, the existing market conditions in the dealer's market. This Market Survey will include the competitive gasoline stations in the dealer's market, the type of gasoline in the dealer's market and the subject dealer's station, a description of the competitive facilities, i.e., number of pumps, bays, hours of operation, etc., and the retail posted prices by grade of product at the competitive locations in the dealer's market. Additionally, the survey must be signed and dated by the Company representative.

After completing the survey, the Company representative will submit it to the Regional Pricing Coordinator, who will process the dealer's request for assistance.

The Regional Pricing Coordinator will forward the request for assistance to the Corporate Pricing Administrator who may, at his/her discretion, agree or disagree to granting assistance and the amount in cents and fractions of cents, per gallon. Aid that is given will, hopefully, meet the competitive market conditions and thereby stimulate volume.

The Company will remit the assistance by credit memo on a weekly basis, within fifteen (15) days after each weekly period.

Although Getty can suggest a retail posting price to its dealer, it can not require a dealer to post a specific retail price on gasoline. This is the case whether a dealer is receiving aid or not. IF YOU OR ANY OF YOUR EMPLOYEES ARE TOLD BY ANY GETTY PETROLEUM MARKETING INC. EMPLOYEE THAT A SPECIFIC RETAIL PRICE MUST BE POSTED AT THE GASOLINE PUMPS, IMMEDIATELY CONTACT IN WRITING, MR. SAMUEL M. JONES, GETTY PETROLEUM MARKETING INC., 125 JERICHO TURNPIKE, JERICHO, NEW YORK 11753, TELEPHONE (516) 338-1550. GETTY PETROLEUM MARKETING INC. WILL NOT TOLERATE ANY SUCH CONDUCT BY ITS EMPLOYEES, AND WE URGE YOU TO NOTIFY US IF SUCH CONDUCT TAKES PLACE.

Dealer assistance is granted to meet competitive market conditions and is temporary. Therefore, at any time, Getty, in its sole discretion, shall have the option to withdraw the aid in whole or in part.

Every dealer has the option to participate in the Program or not and may withdraw or participate, any time the program is in effect. THE "V" IN "TCVA" MEANS VOLUNTARY.

P:\DOC\ENT\TCVA.PRD
04-97

## EXHIBIT A

### Request for TCVA Assistance

Account No: _____

Getty Petroleum Marketing Inc.
125 Jericho Turnpike
Jericho, New York 11753

Gentlemen:

I  _Wahab Hussin_____, the Retail Gasoline Station Dealer at _189 Elkton Rd Newark DE._____ request assistance to meet a severe competitive condition at the retail level in the form of a Temporary Competitive Voluntary Allowance.

I have not been influenced in any way to participate in the Program by any Getty employee.

As a result of this request, I have inquired about the TCVA Program and it has been explained to me and I understand the Program.

I have also received a written copy of Getty's TCVA Program. I understand that the Program is voluntary and that I may withdraw from it at any time.

Very truly yours,

_____
Dealer

_2-5-01_____
Date

Witness:

_____
Company Representative
P&DCORTCVA.LTR
04/97

ADDENDUM TO LEASE AGREEMENT DATED DECEMBER 5, 2001 BETWEEN GETTY PETROLEUM

MARKETING INC., LESSOR, AND H. S. M. Y. INC., LESSEE.


THIS ADDENDUM TO THE ABOVE REFERENCED AGREEMENT BETWEEN COMPANY AND

LESSEE AND ALL THE TERMS AND CONDITIONS OF THE AGREEMENT ALSO APPLY TO THE

AGREEMENT DESCRIBED BELOW.


COMPANY AND LESSEE FURTHER AGREE THAT IN REFERENCE TO PAGE 1 PARAGRAPH 4.


UPON COMPLETION OF MARKETING IMPROVEMENT(S), (1) THE RENT AT THIS LOCATION WILL

INCREASE BY 5,500.00 PER MONTH OVER THE EXISTING RENT AND, (2) MINIMUM GALLONAGE

WILL INCREASE TO 151,700 PER MONTH, THREE MONTHS AFTER IMPROVEMENTS(S) IS/ARE

COMPLETED.


IN WITNESS, THEREOF, THIS ADDENDUM ENTERED INTO THIS DAY DECEMBER 5, 2001.

GETTY PETROLEUM MARKETING INC.

Bernard F. Walker, Regional Manager

BY: _____     BY: _____
Witness                                              Lessee, H. S. M. Y. Inc.

# EXHIBIT

# "D"

## GASOLINE LOAN AGREEMENT

Account Number – <u>086597</u>
Loc. Address – <u>189 Elkton Rd., Newark DE 19711</u>

This gasoline loan agreement ("Agreement") is made <u>December 5, 2001</u> by and between GETTY PETROLEUM MARKETING INC., a Maryland corporation with its principal place of business at 125 Jericho Turnpike, Jericho, NY 11723 ("Getty") and <u>H. S. M. Y. Inc.</u> ("Dealer") with its principal business address or residing at: <u>76 Raintree Dr., Elkton MD 21921</u>.

WHEREAS, Dealer presently is a commission lessee agent of Getty at the following gasoline retail station location <u>189 Elkton Rd., Newark DE 19711</u>;

WHEREAS, Dealer would like to avail himself of a loan from Getty to finance Dealer's current gasoline inventory as an incentive to promote the voluntary conversion of Dealer from commission lessee agent to retail lessee dealer of Getty;

WHEREAS, Getty desires to make such loan to Dealer in order to facilitate the above conversion;

NOW THEREFORE, Getty and Dealer hereby agree to the terms and conditions in respect of such loan as follows:

## SECTION 1. GASOLINE INVENTORY

The gasoline inventory hereby financed shall be the gallons of gasoline inventory of Dealer as read on the date of the Agreement by Dealer and representative of Getty and hereby confirmed in Section 2 below ("Gallons").

## SECTION 2. AMOUNT OF LOAN

The amount of the loan made hereunder shall be the Gallons multiplied by the Dealer Tank Wagon (DTW) price of gasoline on the date of this Agreement, being:

| Products | DTW | | Gallons | | Total |
|---|---|---|---|---|---|
| Reg. Unleaded Gasoline | $ 1.0396 | per gallon (x) | 9147 | Gallons, equals = | $ 9508.22 |
| Plus Unleaded Gasoline | $ | per gallon (x) | | Gallons, equals = | $ |
| Premium Unleaded Gasoline | $ 1.2000 | per gallon (x) | 2341 | Gallons, equals = | $ 2809.20 |
| Diesel Fuel | $ | per gallon (x) | | Gallons, equals = | $ |
| | | | | Loan Total = | $ 12,318.42 |

and the amount of the loan is hereby confirmed to be $ _12,318.42_ ("Loan").

## SECTION 3. TERMS OF THE LOAN

The Loan shall be repayable in thirty (30) equal monthly installments in the amount of $ _410.62_, at the time monthly rent is due by Dealer to Getty. The Loan shall not bear interest, unless there exists an event of default as set out immediately below, in which case the Loan shall become immediately repayable and bear interest in the amount of ten percent (10%) per annum.

**SECTION 4.  EVENT OF DEFAULT**

Any breach by Dealer of any terms or conditions of this Agreement or any other agreements in force between Dealer and Getty ("Retail Lessee Agreements"), or any expiration or termination of the Retail Lessee Agreements, shall constitute an event of default hereunder.

**SECTION 5.  SECURITY FOR THE LOAN**

The Dealer hereby grants to Getty as security for the repayment of the Loan any monies held by Getty as security for rent and gasoline deposits pursuant to the Retail Lessee Agreements, with a right of immediate set off against such monies for the entire amount of the Loan at any time an event of default exists under this Agreement.

**SECTION 6.  MISCELLANEOUS**

(a)    **Entire Agreement.**  This Agreement contains the entire understanding between Getty and Dealer concerning the Loan and replaces all previous agreements, whether oral or written, in respect hereto.

(b)    **Amendments/Waivers.**  No modification of this Agreement, or waiver of the terms and conditions hereof, shall be binding on Getty or Dealer, unless approved in writing by both Getty and Dealer.

(c)    **Governing Law.**  This Agreement shall be governed and construed in accordance with the laws of the State of New York without regard to principles of conflict of law.

**GETTY PETROLEUM MARKETING INC.**

By: _____
Name: Bernard F. Walker
Title:  Regional Manager


By: _____
Name: Dave Schmidt
Title:  Territory Sales Manager


**DEALER**

By: _____
Name: H. S. M. Y. Inc.
Title:

2

# EXHIBIT

# "E"

Account #086597

Mutual Cancellation of
Lease and Lessee Supply Contract

By mutual consent, the Lease, Lessee Supply contract and all related agreements (collectively the "Agreements") between Getty Petroleum Marketing Inc. and **H.S.M.Y. Inc.**, as lessee dated the **5th** day of **December, 2001**, covering premises situated at **189 Elkton Rd.**, in the city of **Newark**, County of **Delaware-North**, state of **DE**, together with any and all amendments thereto, are hereby cancelled and terminated, effective the _28th_ day of _Feb_ _D.05A_, **2003**, provided however, that the cancellation of the agreements shall not relieve either party from any obligation to pay any amounts due or from any liability which has accrued under the agreements prior to the cancellation and termination thereof. As required by section 102(B) (2) (D) of the Petroleum Marketing Practices Act, Lessee has been provided with a copy of this agreement and summary of the provisions of title 1 of said Act.

(Lessee)_____

**H.S.M.Y. Inc.**

*We reserve the right for any legal action to Protect ourself*

Dated: _____

*2/28/03*

*Witness*

GETTY PETROLEUM MARKETING INC

By:_____

Regional Manager