IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HSMY, Incorporated, a Delaware Corporation, a/k/a H.S.M.Y., Inc.<br><br>Plaintiff,<br><br>vs.<br><br>GETTY PETROLEUM MARKETING INC., a Maryland Corporation,<br><br>Defendant. | C. A. No. 05-818-JJF<br><br>TRIAL BY JURY OF TWELVE DEMANDED |

## AMENDED COMPLAINT

Plaintiff, HSMY, Incorporated a/k/a H.S.M.Y., Inc. by and through their attorneys, Basil C. Kollias, Esquire and John C. Andrade, Esquire, sues defendant, Getty Petroleum Marketing, Inc., and states:

## PARTIES

1. Plaintiff, HSMY Incorporated, is a Delaware corporation whose registered agent is Christiana Incorporators, Inc., 508 Main Street, Wilmington, Delaware 19804. The registered agent's phone number is (302) 998-2008.

2. Defendant, Getty Petroleum Marketing Inc., is a Maryland corporation whose registered agent is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The registered agent's phone number is (302) 658-7581.

3. <u>Plaintiff was, until April, 2003, engaged in the retail motor fuel and convenience store business at 905 Basin Road, New Castle, Delaware 19720, the ("New Castle station") under the trade name "Getty".</u>

4. Plaintiff was, until March 30, 2003, engaged in the retail motor fuel and convenience store business at 189 Elkton Road, Newark, Delaware 19711, the ("Elkton Road station") under the trade name of "Getty".

5. Defendant, Getty Petroleum Marketing Inc. ("Getty"), is a Maryland corporation which, since on or about January 25, 2001 (the "Acquisition Date") has been owned and controlled by Lukoil Americas Corporation, and its parent company, LUKOIL Oil Company, a Russian open joint stock company ("Lukoil"). Lukoil is a refiner of petroleum.

6. Defendant Getty is a marketer of "Getty" branded motor fuel and petroleum products in Delaware, Pennsylvania, New Jersey, Maryland and elsewhere in the Northeast and Mid-Atlantic United States. In the Wilmington, Delaware area, defendant markets its branded Getty motor fuel through retail motor fuel outlets as described elsewhere in this Complaint. Upon information and belief, defendant also wholesales its motor fuel to various other purchasers, who purchase such motor fuel at the Getty "rack" at terminals in Paulsboro, New Jersey and Delaware City, Delaware.

## FACTS RELATED TO PRICING ISSUES

7. The sale of motor fuel is a highly competitive and price sensitive "cents per gallon" business, where profit margins are measured in pennies.

8. Until December, 2001, Plaintiff operated the New Castle station under Getty's "Gasway Program," wherein the operators of the gas stations were paid a fixed commission on motor fuel sales.

2

9. Until December, 2001, Plaintiff operated the Elkton <u>Road</u> station under Getty's "Gasway Program," wherein the operators of the gas stations were paid a fixed commission on motor fuel sales.

10. During the period plaintiff operated the business <u>at the New Castle station,</u> it was operated in part pursuant to written lease/supply agreements with Getty, the most recent of which was for the period of December <u>3</u>, 2001 to November 30, 2004 (the "2001 Agreement"). The 2001 Agreement and all prior written agreements between plaintiff and defendant are collectively referenced in this Complaint as the "Agreement". Pursuant to the Agreement, Getty was plaintiff's landlord and exclusive supplier of plaintiff's single largest sales item -- motor fuel. Plaintiff was required to purchase all of its motor fuel requirements from Getty and was prohibited by the Agreement from purchasing motor fuel elsewhere.

11. <u>During the period plaintiff operated the business at the Elkton Road station, it was operated in part pursuant to written lease/supply agreements with Getty, the most recent of which was for the period December 5, 2001 to November 30, 2004 (the "2001 Agreement"). The 2001 Agreement and all prior written agreements between plaintiff and defendant are collectively referenced in this Complaint as the "Agreement". Pursuant to the Agreement, Getty was plaintiff's landlord and exclusive supplier of plaintiff's single largest sales item -- motor fuel. Plaintiff was required to purchase all of its motor fuel requirements from Getty and was prohibited by the Agreement from purchasing motor fuel elsewhere.</u>

12. The Agreement<u>s</u> between plaintiff and defendant contained the following provision regarding the price at which motor fuel was to be sold to plaintiff by Getty:

3

"**PRICE FOR PRODUCTS.** 4. The price for the products sold to Lessee shall be those posted or listed by Company at the time and place of delivery. All prices are subject to change by Company."

<u>13.</u>   Defendant frequently charged wholesale prices to Plaintiff that were equal to or higher than the retail prices on the street.

<u>14.</u>   Upon information and belief, the wholesale prices charged to Plaintiff were neither cost-based nor based on competitive wholesale or rack prices, but were based in whole or in part upon the retail street prices being charged by plaintiff's competitors, were designed to control plaintiff's profit margin, and to force, de facto, plaintiff into a commissioned agent relationship.  <u>This is based upon conversations between the principal of HSMY, Mr. Wassab Hussin, and his wife, Mrs. Shima Hussin, and other Delaware dealers, plus Mr. and Mrs. Hussin's observations of the retail price of competing gasoline stations.</u>

<u>15.</u>   The contractual relationship between Getty and plaintiff was to be one of independence as mandated by both the Agreement and the Delaware Retail Sales of Motor Fuel Act, 6 <u>Del. C.</u> §2901 et seq.

<u>16.</u>   Defendant required plaintiff and its other Delaware dealers (collectively the "Delaware Dealers") to maintain checking accounts into which the defendant could electronically transfer funds ("EFT Credits") for credit card charges made at dealers' stations and from which Getty could electronically withdraw funds ("EFT Debits") for payment of rent, gas purchases, sign and pole charges and rental of credit card equipment.

4

17. On or about March, 2002, defendant initiated a fraudulent scheme (the "Scheme") under which Getty presented the Delaware Dealers, including plaintiff, with invoices at the time of gas deliveries showing one price for the motor fuel, and then at the time of the EFT debit from plaintiff's bank account, increasing the amount of the invoice, thereby allowing the defendant to unlawfully increase the prices for motor fuel after it was delivered, while plaintiff had already set its own retail prices based upon the prices charged by Getty on the invoices provided at the time of delivery.

18. At all relevant times during this Scheme, defendant was aware (a) that the prices on the Delaware Dealers' invoices, including those charged to plaintiff, were lower than the amounts defendant intended to draft, (b) that the Delaware Dealers, including the plaintiff, would not know their prices had been increased until after the motor fuel had been sold at retail, and (c) that the Delaware Dealers, including plaintiff, would lose a portion of their anticipated profits.

19. Upon information and belief, when defendant refused to stop the Scheme, the Delaware Dealers notified the Office of Retail Gasoline Sales (Division of Motor Fuel Tax, Department of Transportation, State of Delaware) of defendant's unlawful conduct, to which defendant refused to respond to two separate inquiries from the Office of Retail Gasoline Sales, whereby the matter was referred to the Attorney General's office for investigation. <u>This is based upon a conversation between the principal of HSMY and Mr. Mike Harrell of the Delaware Office of Retail Gasoline Sales, which occurred shortly after the termination of the franchises, as well as conversations between the principal of HSMY and other Delaware dealers.</u>

20. On April 11, 2002, a meeting was held between representatives of defendant and the Delaware Dealers, at which defendant's vice president of marketing, Mr. A. R. Chames, (a) admonished the Delaware Dealers, including plaintiff, for reporting the Scheme to the State of Delaware, (b) refused to provide any pricing relief to the Delaware Dealers, including plaintiff, and (c) refused to improve the Getty image at the stations operated by the Delaware Dealers, including plaintiff, stating that "none of you are worth it," and advising the Delaware Dealers to "get out" if they did not like the way defendant operated its business.

21. After the Delaware Dealers reported the Scheme to the Office of Retail Gasoline Sales, defendant increased its DTW prices to the Delaware Dealers (including to plaintiff) such that the Delaware Dealers (including plaintiff) were paying wholesale prices equal to or higher than the retail prices being charged by the Delaware Dealers' interbrand competitors.

22. Plaintiff was placed under extreme financial hardship due to Getty's action, resulting in, among other things, trying to operate the gas stations with little to no profit and regularly coming up short in attempting to pay the inflated prices charged by Getty. Getty in turn imposed a requirement of cash payments for all deliveries, and withholding their credit card receipts forcing Plaintiff to operate with no capital.

23. On or about December 5, 2002, Getty sent Plaintiff a termination letter terminating their New Castle franchise due to a "history of returned Electronic Funds Transfers," a situation wholly caused by Getty.

24. On or about December 5, 2002, Getty sent Plaintiff a termination letter terminating their Elkton Road franchise due to a "history of returned Electronic Funds Transfers," a situation wholly caused by Getty.

25. On or about March 30, 2003, due to this extreme financial hardship, Plaintiff was forced to turn the Elkton Road franchise back over to Getty.

26. On or about March 30, 2003, due to this extreme financial hardship and threat of losing all its goodwill, Plaintiff was forced to sell the New Castle franchise at significantly below market value.

## COUNT I

## VIOLATION OF ARTICLE 2 OF THE UNIFORM COMMERCIAL CODE

27. Plaintiff restates by reference the allegations referenced in paragraphs 1-26 supra.

28. Sales of motor fuel by Getty to plaintiff involved transactions in goods governed by Article 2 of the Uniform Commercial Code ("UCC") as codified in 6 Del. C. §2-101 et seq.

29. In connection with the sale of motor fuel to plaintiff under the Agreement, defendant alone set the price plaintiff was charged for such motor fuel. Under §2-305 of the UCC [6 Del. C. §2-305] defendant was required to set its wholesale motor fuel prices to plaintiff honestly and in good faith, pursuant to reasonable commercial standards of fair dealing in the trade.

30. Defendant violated §2-305 by, among other things:

    A.    Charging plaintiff unfair, unreasonable and uncompetitive prices for motor fuel;

    B.    Charging plaintiff prices for motor fuel that were set in bad faith in relation to its rack prices;

    C.    Charging plaintiff prices for motor fuel, which in whole or in part were based on the retail prices of several of plaintiff's competition, in an effort to control plaintiff's motor fuel margin;

    D.    At times changing the price after delivery and otherwise failing to act honestly and pursuant to reasonable commercial standards of fair dealing in the trade in connection with the pricing and sale of its motor fuel to plaintiff.

    31.    Plaintiff notified defendant regularly that the prices it charged to plaintiff were unreasonable, discriminatory, set in bad faith, and were causing damage to plaintiff's business and property.

    32.    As a direct and proximate result of defendant's unlawful conduct, plaintiff was damaged.

## COUNT II

## VIOLATION OF THE DELAWARE RETAIL GASOLINE SALES LAW

    33.    Plaintiff restates by reference the allegations referenced in paragraphs 1-32 supra.

34. Plaintiff was a "Dealer," Getty was a "Distributor" and a "Manufacturer" and the Agreement was a "Marketing Agreement" under 6 Del. C. Chapter 29 and the Regulations promulgated thereunder.

35. 6 Del. C. §2909(4) states:

"The price at which a retail dealer sells products shall not be fixed nor maintained by a manufacturer, nor shall any person seek to do so, nor shall the price of products be subject to enforcement or coercion by any person in any manner. Nothing herein shall be construed to prohibit a manufacturer from suggesting prices and counseling with dealers concerning prices. Each agreement between a manufacturer and a dealer shall have, in 10-point type, the legend: 'PRICE FIXING OR MANDATORY PRICES FOR ANY PRODUCTS COVERED IN THIS AGREEMENT IS PROHIBITED. A SERVICE STATION DEALER MAY SELL ANY PRODUCTS LISTED IN THIS AGREEMENT FOR A PRICE WHICH HE ALONE MAY DECIDE'."

36. Defendant repeatedly violated 6 Del. C. §2909(4), directly or indirectly, by charging plaintiff DTW prices designed to control and fix plaintiff's retail prices. Furthermore, defendant unlawfully operated retail gasoline stations in Delaware with commissioned agents under that Gasway Program.

37. Following the State of Delaware's forced termination by defendant of its Gasway Program, defendant converted the operation of its Gasway locations from commissioned agents to purportedly independent dealers. Defendant thereupon

9

devised a plan, through the use of temporary competitive voluntary allowances (the "TCVA Program"), to circumvent the Delaware retail divorcement statute and return the Gasway location "dealers" back into de facto commissioned agents. Under the revised TCVA Program, in effect since November 2001, the maximum profit defendant "allowed" the Gasway location dealers to earn was 5.5 cents/gallon, the same commission the defendant paid to the Gasway Operators under its previous Gasway Program.

38. Defendant, in violation of 6 Del. C. §2909(4), maintained control of the retail prices indirectly at the former Gasway locations by substituting the TCVA Program for the Gasway Program.

39. The repeated and ongoing violations by defendant under 6 Del. C. §2909(4) substantially lessened plaintiff's ability to compete with the interbrand dealers in the Wilmington, Delaware area. As a direct and proximate result of such actions, plaintiff was damaged.

**COUNT III**

**FRAUD**

40. Plaintiff restates by reference the allegations referenced in paragraphs 1-39 supra.

41. Defendant, through its agents, made material and repeated misrepresentations and/or omissions of material facts which defendant knew were false when made and would be relied upon by plaintiff to its detriment. Misrepresentations and omissions by defendant were intended to cause, and in fact did cause, plaintiff to enter into the 2001 Agreements. Defendant's agents that initially made those

<u>misrepresentations and omissions were Dave Schmidt, Territory Sales Manager and Bernard F. Walker, Regional Manager, during conversations with the principal of HSMY and his wife, both before and during the term of the agreements.</u>

<u>42.</u>   The material misrepresentations, omissions and fraudulent conduct by defendant included, but are not limited to, the following:

    A.   Defendant's misrepresentations regarding the establishment of a bank account for EFT Debits. Defendant assured plaintiff that (1) no draft would occur until defendant had transmitted a facsimile notice of the draft; and (2) that the only items which would be drafted would be payment for (a) rent; (b) gas deliveries; (c) sign and pole charges; and (d) credit card equipment rental. In fact, defendant made EFT Debits without notice and for items which plaintiff had not agreed to pay by EFT Debits. Plaintiff had no means to stop unauthorized EFT Debits, and defendant fraudulently charged, attempted to charge or overcharged plaintiff by EFT Debits for maintenance charges, late payment fees, interest charges and miscellaneous charges;

<u>43.</u>   As a direct and proximate result of defendant's fraudulent misrepresentations and omissions of material facts, and plaintiff's justifiable reliance thereon, plaintiff was damaged. The aforesaid unlawful and fraudulent conduct of defendant was continuous, repetitive, willful and wanton.

<u>44.</u>   At the time of the aforesaid fraudulent acts and/or omissions, plaintiff did not know, nor by the exercise of due diligence did plaintiff have reason to know, that

defendant fraudulently concealed material facts from plaintiff or intended to be dishonest in the conduct of its business.

## COUNT IV

## BREACH OF CONTRACT

<u>45.</u>   Plaintiff restates by reference the allegations referenced in paragraphs 1-44 <u>supra</u>.

<u>46.</u>   The Agreement between plaintiff and defendant was a contract.

<u>47.</u>   Defendant repeatedly and intentionally breached its obligations to plaintiff under the Agreement, including but not limited to the following:

    A.   Breached the open price term of the Agreement by charging plaintiff unreasonable and uncompetitive motor fuel prices, causing a decline in gross sales and depriving Plaintiff of the operating capital necessary to maintain its business and property;

    B.   Breached the agreement regarding EFT Credits and EFT Debits by unlawfully debiting funds from plaintiff's account and delaying the credit of monies properly owed;

<u>48.</u>   As a direct and proximate result of defendant Getty's breaches, plaintiff was damaged.

## COUNT V

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

<u>49.</u>   Plaintiff restates by reference the allegations referenced in paragraphs 1-48 <u>supra</u>.

50. Defendants have breached the implied covenant of good faith and fair dealing, and Plaintiff is entitled to recovery for damages that ensued from such breach.

## COUNT VI

## DELAWARE DECEPTIVE TRADE PRACTICES ACT

51. Plaintiff restates by reference the allegations referenced in paragraph 1 - 50, supra.

52. Defendant engaged in deceptive trade practices when in the course of its business it invoiced at prices different that it charged Plaintiff at delivery and operated its EFT credits and debits so as to cause actual confusion or misunderstanding.

WHEREFORE, Petitioner requests that judgment be entered in Plaintiff's favor and that it be awarded pecuniary losses arising out of Defendant's breach; compensatory damages; treble damages pursuant to 6 Del. C. §2533; punitive damages; pre-judgment and post-judgment interest; attorneys fees; costs; and such other relief as may be just and appropriate.

PARKOWSKI, GUERKE & SWAYZE, P.A.

/s/ Basil C. Kollias
BASIL C. KOLLIAS, ESQUIRE, I.D. #4063

/s/ John C. Andrade
JOHN C. ANDRADE, ESQUIRE, I.D. #1037
116 West Water Street, P. O. Box 598
Dover, DE  19903
(302) 678-3262

DATED: February 3, 2006        Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HSMY, Incorporated, a Delaware Corporation, a/k/a H.S.M.Y., Inc. : | C. A. No. 05-818-JJF |
| Plaintiff, : | TRIAL BY JURY OF TWELVE DEMANDED |
| vs. : | |
| GETTY PETROLEUM MARKETING INC., a Maryland Corporation, : | |
| Defendant. : | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 3rd day of February, 2006, that a copy of the foregoing

AMENDED COMPLAINT was served electronically on the following counsel of record:

Matt Neiderman, Esquire
DUANE MORRIS, LLP
1100 North Market Street, 12th Floor
Wilmington, DE 19801

PARKOWSKI, GUERKE & SWAYZE, P.A.

/s/ John C. Andrade
JOHN C. ANDRADE, ESQUIRE, I.D. #1037
116 West Water Street, P. O. Box 598
Dover, DE  19903
(302) 678-3262
Attorneys for Plaintiff

DATED: February 3, 2006